sale of the old residence to the administratrix, Mrs. Amanda Herring Watts.

The judgment appealed from is annulled and reversed, and it is ordered and decreed that the plaintiff's suit be dismissed at her cost.

---

(69 South. 141)

No. 20130.

ELIAS v. MAYOR AND BOARD OF TRUSTEES OF CITY OF NEW IBERIA.

(June 11, 1915.)

*(Syllabus by Editorial Staff.)*

1. ELECTRICITY ⬳19 — CAUSE OF DEATH — SUFFICIENCY OF EVIDENCE.

In an action against defendant city for death of plaintiff's wife by an electric shock from defendant's power wire in contact with a wire clothesline, evidence *held* sufficient to show the cause of death as charged.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 11; Dec. Dig. ⬳19.]

2. ELECTRICITY ⬳16 — DUTY OF CITY TO WIRE HOUSE—NEGLECT.

Where a city is responsible for seeing that a house wired for electricity is properly connected to its power line, it cannot relieve itself of such duty by neglecting to give any attention to the matter, and is liable for defective work unless the property owner voluntarily undertakes to do the work himself.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 9; Dec. Dig. ⬳16.]

3. MUNICIPAL CORPORATIONS ⬳751—TORTS —DUTY OF CITY TO WIRE HOUSE—INDEPENDENT CONTRACTORS.

The charter of defendant city provided that, except in the case of a public building, no one, save by authority of the department of public properties, should be permitted to tap or connect with any of the water mains, light or power wires, nor should the trustee permit the connecting of water mains or wires with those of any such buildings or places wherein the plumbing or wiring has been done, extended, repaired, or tampered with by other parties. Plaintiff's wife was killed by an electric current which reached her through a wire clothesline in contact with defendant city's power wire, which supplied plaintiff's house, and which had been negligently installed by a claimed independent contractor. *Held,* that the city was responsible for the wire coming in contact with the clothesline, since the ordinance imposed on it an absolute obligation to attend to the wiring, giving plaintiff the right to assume that the person installing it was the agent of the city for doing the wiring, so that the responsibility for any defect in the work rested on the city, not on the plaintiff.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1580–1582; Dec. Dig. ⬳751.]

4. ELECTRICITY ⬳16—DEFECTIVE WIRING— NEGLIGENCE.

Where a wire connecting a house with the city's power line was so strung that a wire clothesline, when raised by a pole, as is customary, would come in contact with it, such wire connection with the power line was negligently defective, since due care requires that conductors of electricity be so placed with reference to similar conducting agencies that dangerous contacts are not probable.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 9; Dec. Dig. ⬳16.]

5. ELECTRICITY ⬳18—INJURIES—CONTRIBUTORY NEGLIGENCE.

Where defendant city, in connecting plaintiff's house with its electric light line, strung its wire in such a position that, when plaintiff's wire clothesline was raised by a pole after the clothes were hung out, it would come in contact with the light wire, plaintiff's wife, in so raising the clothesline, incurring a shock resulting in death, was not guilty of contributory negligence, since a person incurring an unknown danger, which he is not bound to know of, is not negligent.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 10; Dec. Dig. ⬳18.]

6. MUNICIPAL CORPORATIONS ⬳733—SUPPLY OF ELECTRICITY—LIABILITY OF CITY.

The liability of a municipal corporation, which lawfully engages in the business of operating an electric light plant to light streets and public places and to sell current to its inhabitants, is governed by the rules applicable to any private corporation or individual conducting a similar enterprise.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1547–1549, 1561; Dec. Dig. ⬳733.]

7. DEATH ⬳31 — DEATH OF WIFE — HUSBAND'S RIGHT OF ACTION.

A husband has no right of action on his own behalf for the death of his wife.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 25, 37–46, 48; Dec. Dig. ⬳31.]

8. DEATH ⬳107 — DAMAGES — DEATH OF MOTHER.

In an action by a husband on behalf of his children against defendant city for death of his wife, electrocuted through defendant's negligence, judgment for $1,000 in favor of each of her eight children, ranging from 5 months to 17 years, was proper.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 152; Dec. Dig. ⬳107.]

O'Niell, J., dissenting.

Appeal from Nineteenth Judicial District Court, Parish of Iberia; James Simon, Judge.

Action by Assad Elias against the Mayor and Board of Trustees of the City of New Iberia. Judgment for defendant, and plaintiff appeals. Affirmed in part, set aside in part, and judgment entered for plaintiff.

Burke & Smith, of New Iberia, and Lazarus, Michel & Lazarus, of New Orleans, for appellant. L. O. Hacker, City Atty., of New Iberia, for appellee.

PROVOSTY, J. The defendant city furnishes electrical light and power to its inhabitants, and charges for the service, the same as a private corporation might do.

Plaintiff's wife fell dead while she was in the act of hanging a wet sheet upon a wire clothesline in the back yard of her residence. The cause of her death is one of the points in dispute. Plaintiff contends that the wire clothesline had become charged with electricity from the electrical light wire of the defendant, and that she was electrocuted. Defendant contends that she died of heart failure, or apoplexy, or some other internal cause. The ground on which the woman stood was wet from rain, and the sheet and her hands were wet; so that she completed the circuit for the death-dealing fluid, if the fluid was present in the wire. Was it?

The wire clothesline passed under an electric light wire between the house and the store of plaintiff, and went to a wooden post in the back yard of plaintiff's house, and from this wooden post it went to another wooden post in the back yard. This clothesline was raised by some one with a clothesline pole, and thereby brought in contact with the light wire. Who did this is not ascertained. But it was some one in plaintiff's household; most probably the colored girl who on the occasion in question was helping plaintiff's wife in the washing.

[1] One of the contentions of defendant is that the clothesline was in two sections, one extending between the two wooden posts, and the other, the one which was in contact with the electric light wire, extending from one of the wooden posts to the front, and that there was a space of an inch or two between them on the wooden post to which they were fastened.

Two witnesses produced by defendant so testified. One of them was a member of the electric light and water board of the city, and was therefore one of the officials who would have to bear the burden of the blame should a judgment in damages be rendered against the city. This official went to the place and made an investigation as soon as he heard of the event, and took with him a Mr. Cardova, one of the employés of the light and power plant, with his instrument for making a test. They reached the place about an hour and a half after the event. It was then the witness ascertained, as he says, this discontinuity of the clothesline. Notwithstanding this discovery, which was proof conclusive against the theory of an electrocution —for, if the clothesline was in two disconnected sections, the electric current could not possibly have passed from the section which was in contact with the electric wire to the one upon which the sheet was hung— the witness proceeded to have a test made of the electric wire for ascertaining its voltage, and found the usual voltage of 110.

In his statement regarding this discontinuity in the clothesline he is corroborated by the coroner of the parish. This official went to the place, still later in the day, to investigate. He first ascertained that the clothesline was in two sections, and made up his mind that there had been no electrocution, and then, as he says, proceeded to make an autopsy for ascertaining whether the woman had died from an electric shock; for concluding that she had not, he gives as his reason that if she had, her blood would have been red, whereas it was not. He says that

her heart was small, and its walls thin, and its muscles "not firm and strong, as you usually find in a healthy subject; it was soft and flabby. The woman was in bad condition; she was flabby; her legs were demitis, and her liver enlarged." Two physicians who were present with him at the autopsy, one of whom had been called by himself, say that the heart was perfectly normal. One of these physicians, the family physician of the plaintiff's family, and who about a year before the woman's death had made a thorough examination of her, says that she was a perfectly healthy person; and the evidence shows that she was between 35 and 40 years of age, a healthy woman, strong and active. This physician says that after an electric shock capable of producing death the blood would not continue to be red as long as an hour and a half.

It is safe to say, we think, that if the clothesline had been found by the two officials to be in disconnected sections, they would not have gone to the trouble of an autopsy and a test of the voltage, but rather, if apprehending a suit in damages, would simply have procured witnesses to view the situation, so as to be prepared to establish in court beyond controversy the fact of disconnection, and thereby put a quietus upon all thought of a lawsuit.

Opposed to the testimony of these two officials stands that of plaintiff and of a relative of his, and that of a Mr. Aucoin, an entirely disinterested witness. Mr. Aucoin, who lived on the opposite side of the street, on hearing the screams in plaintiff's yard, rushed over, and was one of those who helped to carry the body into the house. He then went back into the yard, and, hearing it said that the woman had been electrocuted, made an investigation. He saw where the clothesline was in contact with the electric wire, and, following this clothesline, saw that it was a continuous line which wound around the first wooden post for support, and then went on to the second wooden post.

The testimony of these two officials is further contradicted by that of plaintiff and three disinterested witnesses, who say that on touching the wet sheet they received an electric shock. One of these witnesses adds that he warned the bystanders against touching this sheet, as they would receive a shock if they did.

It is suggested that these witnesses only imagined that they had been shocked. We cannot adopt that supposition as against their positive testimony. Nor does the fact that in their case the shock was innocuous militate against the credibility of their statement. Electricity is known to be freakish in its action, and the woman had been washing clothes in this wet yard, and her hands and shoes were wet, the latter probably saturated.

The same Mr. Aucoin testifies that he noticed that the body was, as he expresses it, "all cripped up; * * * you might say drawn up." And this contraction of the muscles of the dead woman is testified to by others. An electric current has the effect of contracting the muscles. Whether this effect endures after the current has ceased we are not advised.

The defendant next urges that, as ascertained by the test that was made, and as known from the invariable mode of operating the light plant, there were but 110 volts in the light wire, and therefore not enough to kill the woman.

There is testimony to the effect that even a lower voltage than this may destroy healthy human life under given conditions; and there is no very satisfactory evidence against that possibility. But we do not see the necessity of going into that question. If the evidence shows that the woman was electrocuted, and, to our minds, it does so show beyond serious dispute, it can make

no difference whether it was done by means of the usual voltage of 110, or by a higher voltage that may have leaked into the light wire from the power wire with which it was connected by a converter.

The serious question in the case is whether the defendant is responsible for the lighting wire having come in contact with the clothes-line.

The facts needing to be stated for the consideration of that question are as follows: Plaintiff went to the office of the New Iberia electric light and water works, or, in other words, of the defendant, and saw the manager, and stated to him that he wanted to have electric lights put in his house and store, and a man named Cardova came from the power plant and did the work, and plaintiff paid the bill presented by Cardova. The latter says that he was working for the light plant at that time, but that he did the work as an independent contractor and in his own time on Sunday; but he does not pretend to have informed plaintiff that it was not the light plant authorities who were having the work done. On his direct examination he said:

"I was working for the plant, but I done it in my own time on a Sunday. Q. Who sent you there to do it—Mr. Elias or the town? A. No one but myself. He had it out on bids, and I was the lowest bidder, and I got the job."

On cross-examination he said:

"Q. You are presently employed by the defendant company? A. Yes, sir. Q. The city of New Iberia? A. Yes, sir. Q. How long have you been employed by them? A. The plant was installed in 1901, and I went to work with them in 1902. Q. Were you working for the city of New Iberia at the time you installed these wires for Mr. Elias? A. Yes, sir. Q. Don't you know, as a matter of fact, that Mr. Elias, when he wanted the wire put in, came to the office of the New Iberia Electric Company and made application to have his house wired? A. Not that I know of. Q. Is it not a fact that you were sent to Mr. Elias by some one in the office of the New Iberia Electric Company? A. Yes, sir. Q. Who sent you? A. I heard Mr. Broussard say that he wanted some lights, and I went out and figured on

them. Q. Who is Mr. Broussard, and who was he then? A. He was city electrician then. Q. And in charge of the company's plant? A. Yes, sir. * * * Q. But one thing you do remember is that Mr. Elias did not come and seek you out and employ you to wire his house? A. No, sir; I gave him a bid. He could have accepted it or rejected it, just as he wanted to."

There is nothing to indicate here that Elias knew or supposed that Cardova was not acting as the agent of the light plant. The fact that he made payment to Cardova is insignificant in view of the fact that it was to the same Cardova he subsequently made his payments for the light service. When Cardova in his direct examination stated that Elias invited bids, he meant no more than what he said in his cross-examination, namely, that he heard that Elias wanted to have the work done.

Plaintiff is a Syrian, who came to this country some years ago, and testifies that he is entirely ignorant on the subject of electricity. There can be no dispute that he relied entirely upon the public authorities for the installation of these wires, and in no way, shape, or form exercised any judgment of his own in the matter beyond desiring that lights should be installed in his store and house, and that the city authorities should have it done.

But it is contended that, as a matter of fact, the city authorities did not at that time attend to having such wiring done, or supervise the doing of it, or inspect it after completion, but left all this to the proprietor, and contented themselves with letting on the current, or "cutting in," as the expression is, on being notified that the wiring had been done; and the evidence shows that such was, in fact, the practice then, though not now, and the question is whether the city was thereby relieved from responsibility.

[2, 3] The responsibility for seeing to it that the wiring of this house was safely done rested upon some one; either upon the city,

or upon the proprietor, the plaintiff. If upon the city, she could not relieve herself of it by simply neglecting to give any attention to the matter, but letting things take their own course; and therefore she is responsible for any defective work from which injury has resulted, unless the proprietor relieved her of the responsibility by voluntarily taking it upon himself. The plaintiff has done nothing of the kind; and hence the sole question is whether this responsibility rested upon the city.

We think it did. The charter of the city provides as follows:

"Except in the case of a public building, no one, save by authority from the department of public properties, shall be permitted to tap or connect with any of the water mains, light or power wires; nor shall said trustee permit the connecting or the continuation of connection of said water mains or wires with those of any such building, or place wherein the plumbing or wiring, as the case may be, has been done, extended, repaired, or tampered with by other parties."

Here the absolute obligation is imposed upon the city to herself attend to the wiring. The plaintiff, therefore, had a perfect right to assume that Cardova was the agent of the city for doing the wiring work upon his house; and, in consequence, the responsibility for any defectiveness in said work rested entirely upon the city, and in no way upon plaintiff.

[4] Was the wiring negligently defective? Upon that point the event might be left to speak for itself. If it had not been, the accident would not have happened. The wire, instead of being strung as high as possible, and close to the house as possible, so as to be as much as possible out of the way, was strung in such a way that the clothesline which was already there would come in contact with it when lifted by means of a pole, as is usually done with a clothesline after the clothes have been put upon it.

[5] This lifting of the clothesline is plead-

ed as constituting contributory negligence on the part of the person who did it, for whose act plaintiff is responsible. But a person who incurs a danger hidden and unknown, and which he or she was under no obligation to have knowledge of, cannot, in the nature of things, be said to have been negligent. Clements v. La. Electric Light Co., 44 La. Ann. 692, 11 South. 51, 16 L. R. A. 43, 32 Am. St. Rep. 348; 29 Cyc. 430. In Hanton v. N. O. & Carrollton R., L. & P. Co., 124 La. 562, 50 South. 544, this court said:

"Householders know nothing whatever of electricity, nor what the requirements call for to insure safety."

That the placing of this electric wire directly above and within a few feet of this wire clothesline, so that the ordinary and customary lifting of the clothesline with a pole would bring the two in contact, constituted negligence, there can be, we think, no serious question. In the case of Simmons v. Shreveport, etc., 116 La. 1033, 41 South. 248, this court quoted from Hebert v. Lake Charles, 111 La. 522, 35 South. 731, 64 L. R. A. 101, 100 Am. St. Rep. 505, as follows:

"Due care requires that those using wires or conductors of electricity so to place and maintain them with reference to similar conducting agencies that dangerous contact is not probable."

This woman, in the discharge of her household duties on her own premises, was suddenly done to death. Whose the responsibility? If her husband's, or her own, or that of any one of her young children, or of the colored girl who raised this pole, then people such as they need set about at once informing themselves about the ways of electricity. The law imposes no such duty, but imposes upon those who make it their business to deal in this dangerous agency to see to it, as far as the utmost care will make possible, that it does not escape and do harm.

[6] It is only necessary that we should

add, quoting from 9 Ann. Cases, note, page 851, that:

"The liability of a municipal corporation which lawfully engages in the business of operating an electric light plant both for the purpose of furnishing light for its own streets and public places and for the purpose of selling light to its inhabitants is governed by precisely the same rules as are applicable to a private corporation or individual when engaged in conducting a similar enterprise."

See, also, authorities cited in Borell v. Cumberland Telegraph & Telephone Co., 133 La. 634, 63 South. 247.

Remains the fixing of the amount of the damages—always a most embarrassing task for this court. The suit is in behalf of plaintiff for the loss of his wife and of his minor children for the loss of their mother. He claims for himself $5,000 for mental anguish, and $5,000 for loss of services, etc., and for his children for the loss of their mother. The ages of the eight children range from 5 months to 17 years.

[7] Plaintiff has no right of action in his own behalf; a husband not having a right of action for the death of his wife. Flash v. La. W. R. R. Co., 68 South. 636, ante, p. 352, No. 20066 of the docket of this court.

[8] We think that a judgment of $1,000 for each of the children, or $8,000 in all, will satisfy the ends of justice.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed in so far as it rejects the suit of the plaintiff in his own behalf, and that it be otherwise set aside, and that there now be judgment in favor of Edna, Elias, Victor, Harriet, Valentine, Bernard, Marie, and Edward Elias in the sum of $1,000 to each, or $8,000 in all, with legal interest from this date, against the city of New Iberia, defendant herein, and that the said defendant pay the costs of this suit.

O'NIELL, J., dissents.