## TODARO v. CITY OF SHREVEPORT et al. (SOUTHWESTERN GAS & ELECTRIC CO., Intervener). *

### No. 5205.

Court of Appeal of Louisiana. Second Circuit.

Oct. 30, 1936.

*Rehearing denied Dec. 11, 1936.

J. H. Jackson, R. H. Switzer, and Cook
& Cook, all of Shreveport, for appellants.

Harry V. Booth, T. O. Brooks, and Wilkinson, Lewis & Wilkinson, all of Shreveport, for appellee.

HAMITER, Judge.

Injuries sustained by plaintiff, Victor H. Todaro, caused his instituting this suit against the State Fair of Louisiana (hereafter referred to as "Fair"), a Louisiana corporation with its domicile in Shreveport, and the city of Shreveport (herein known as "City").

The Fair conveyed unto the City, in the year 1910, a certain tract of land located in Caddo parish, with all buildings and improvements thereon, which it had owned and operated as a fairgrounds. A stipulation embodied in the act of transfer was that the described property was to be held "in perpetuity by the said City of Shreveport for a public park and for Fair Ground purposes; the said State Fair of Louisiana hereby retaining the use of and full control of the said property in its entirety for thirty (30) days in each year for the State Fair, and to retain and have full control of the Club House, race track and infield at all times during the life and existence of the State Fair of Louisiana."

During the years 1933 and 1934, the federal government, through an agency known as the Civil Works Administration (hereafter referred to as CWA), was carrying on a program of relieving unemployment throughout the United States. Under the plan, states, cities, and other political subdivisions were encouraged to and did make application for assistance in constructing permanent improvements. If and when the respective application was accepted and the proposed improvements approved, the CWA furnished the necessary labor and some materials, and the applicant provided the remaining required materials. As the Fair was desirous of improving the property in question, and not being itself eligible to apply for CWA aid, it persuaded and induced the City, during the month of December, 1933, to sponsor a project embracing the contemplated improvements and to submit the necessary application therefor. CWA approval of the proposal was later obtained and the work thereunder was commenced. The project contained numerous improvement items, including the demolishing and salvaging of the old Machinery Building which was then located on the fairgrounds.

On the morning of February 28, 1934, the construction crew of the Southwestern Gas & Electric Company, Incorporated, was dispatched to the fairgrounds, pursuant to a request, with the view and purpose of removing a guy wire that was attached at one end to an electric light pole belonging to that company, and at the other end, to the front portion of the Machinery Building, which was then undergoing the process of demolition. This crew consisted of plaintiff and four other workmen. The truck conveying them arrived at the fairgrounds at approximately 8:15 o'clock and was parked across the street from and almost in front of the building in question. Plaintiff, who was the truck driver and also a helper, and a negro workman, Ed Brooks, descended from the vehicle and walked to the front entrance of the building, the negro carrying a ladder which he had removed from the truck. While standing on the sidewalk, plaintiff was crushed and severely injured by the falling of an overhanging shed or canopy, constructed of heavy materials, which was a part of the building and was located immediately above the point of entrance of the guy wire.

Various acts of negligence are charged to the defendants in this suit for damages. In their answers, defendants denied all negligence and that they were in any manner responsible for the injuries sustained; and urged several special defenses, including contributory negligence on plaintiff's part, which was pleaded in the alternative.

The Southwestern Gas & Electric Company, Incorporated, plaintiff's employer, intervened in the suit and prayed for judgment against all parties litigant, decreeing that it be paid by preference and priority, out of any judgment that plaintiff might recover, all medical expenses paid, and all compensation payments made and to be made on account of the accident and injury.

A jury trial resulted in a verdict in plaintiff's favor for $50,000, and in favor of intervenor as prayed for. Thereafter motions for a new trial, filed by both defendants, were argued and submitted. On plaintiff's counsel entering a remittitur for $25,000, the motions were overruled.

Judgment was thereafter signed condemning defendants, in solido, to pay to plaintiff the sum of $25,000, with legal interest from judicial demand and all costs, and ordering that intervener be paid, by preference and priority, the sum of $250 as medical and

hospital expenses, and the sum of $1,121.25 as compensation paid to plaintiff up to and including May 29, 1935, with legal interest on said amounts from February 2, 1935, until paid, and whatever additional compensation payments intervener has paid or is liable and obligated to pay plaintiff in the future.

After the rendition of the judgment, the Fair was placed in receivership. The appointed and qualified receiver was made a party to the suit, and both defendants appealed from the judgment.

The record in this case may be correctly described as one of voluminous proportion, for it contains in excess of 1,000 pages, exclusive of counsel's briefs. Besides the prodigious bulkiness of the record, our difficulties are enhanced by the fact that 849 pages of it provide the recorded testimony of an array of witnesses which is conflicting beyond description, particularly on matters that are very essential to a decision of this cause. By reason of all of this, we will not be permitted to furnish in this opinion a liberal discussion of the oral evidence, but must content ourselves principally with reciting the facts relating to each particular issue as we find them, and to apply the law according to our appreciation of it.

■ It is seriously urged and argued by one of the defendants that plaintiff was a licensee on the property when injured, and not an invitee; and that there can be no recovery by him for the reason that a licensee takes the premises as he finds them and the only duty the owner owes is to refrain from actively and wantonly injuring him. According to our view of the case, the premise of this contention is not well founded. In the first place, Todaro was injured while standing on a sidewalk which was available to all pedestrians. This was located immediately in front of the Machinery Building, and adjacent and parallel thereto was a public street open at all times to various kinds of vehicular traffic. The Machinery Building, sidewalk, and street were situated on the fairgrounds property and all belonged to the city of Shreveport. In the second place, the evidence is convincing that plaintiff and his co-workers were sent to the location by their employer for the purpose of removing the guy wire which was attached to the Machinery Building, as requested by the superintendent of the men who were undertaking the demolition of such building. The removal of such a wire in many instances, if not conducted skill-

fully by those deft in that kind of work, results in harmful consequences to persons and property, and for that reason the owner of the wires insists that its skilled employees be permitted to do the necessary work. Possessing knowledge of the dangerousness of the situation and of the owner's policy, the superintendent made the removal request and the crew appeared in response thereto. In the case of Myers v. Gulf Public Service Corporation, 15 La.App. 589, 132 So. 416, 421, it was said:

"As respects the question whether a person is on premises as a licensee or by invitation, ' "invitation" is inferred where there is a common interest or mutual advantage, while license is inferred where the object is the mere pleasure or benefit of the person using it.' Southern R. in Kentucky v. Goddard, 121 Ky. 567, 89 S.W. 675, 676, 12 Ann.Cas. 116 (quoting and adopting distinction stated in 1 Whart.Neg. § 349)."

We think that it was to the common interest of all concerned that the crew, of which plaintiff was a member, was sent to the premises. For this reason, and as the sidewalk was a public way, the injured person was an invitee and not a licensee.

■ We are next confronted with the question of whether or not there was negligence in the manner and method of demolishing the building. The demolition work, which was performed by CWA workmen, was commenced at the top and rear of the building and progressed toward the front. Immediately preceding and on the occasion of the accident, practically all of its roof, sides, and rear had been demolished, while most of the front portion thereof, consisting of the wall, canopy, and columns, remained standing. The front wall was of an open air type, possessing several large windows and other openings, and the canopy attached thereto overhung the sidewalk. According to our findings, and evidently according to those of the jury which tried the case, there were no guard rails, barricades, or other objects across the sidewalk in front of the building to protect and warn persons who might use that public way or might approach the point where the accident occurred, although much conflicting testimony appears in the record with reference to their existence and presence. We are also satisfied that the falling of the canopy, with resultant injury to Todaro, was due to the weakening of the front wall through the demolition method employed by the workmen, and particularly their failure

to afford proper and necessary supports therefor after having caused the collapse and removal of the roof and other structural portions which had previously served to maintain such wall and its attendant parts, particularly the canopy. This, in our opinion, was negligence on the part of those engaged in the demolition undertaking.

Plaintiff's counsel forcefully contend that the workmen who were engaged in tearing down the building were servants of the City and the Fair, and that the defendants are liable for their negligent acts under the master and servant doctrine. With equal force, defendants' counsel argue that such workmen were not their servants, but were servants and employees of the CWA which occupied a relation to the defendants closely akin to that of independent contractor and employer, and that the doctrine which affords immunity to the employer for the tortious acts committed by independent contractors is here applicable.

In 39 Corpus Juris, verbo Master and Servant, §§ 1453 and 1454, we find the following with reference to the matter of determining when the relation of master and servant exists:

"The relation of master and servant exists where the employer selects the workman, and may remove or discharge him for misconduct, and may order not only what work shall be done, but the mode and manner of performance." Section 1453.

"To constitute the relation of master and servant for the purpose of fixing liability on the former for acts of the latter under the doctrine of respondeat superior, it is indispensable that the right to select the person claimed to be a servant should exist. Furthermore something more than the mere right of selection is essential to the relation. This right must be accompanied with the power and duty to control the alleged servant while in his employ; this, it is said, is one of the principal tests of the relation. If workmen do not stand in such relation to the person sought to be charged as to make it his duty to control them, they are not his servants and he is in no sense responsible for their acts under the doctrine of respondeat superior. Where the person employed is in the exercise of an independent and distinct employment, and not under the immediate control, direction, or supervision of the employer, the latter is not responsible for the acts of the former." Section 1454.

According to our appreciation of the evidence, all CWA workmen, including those used in demolishing the Machinery Building, were employed, paid, and discharged by the CWA through its proper authorities. As before stated, the purpose of creating and maintaining that entity of the federal government was to provide employment for the numerous unemployed throughout the United States. In the case of the project in question, the workmen were selected by and through the Caddo parish office of the CWA, which was operated by a district supervisor and his assistants, and were dispatched to the fairgrounds. There they were placed under the direction and control and in the charge of the project superintendent who was also on the federal pay roll and who was assisted by several other CWA employees as labor foremen on particular sections of the project. The sponsors of the work, the defendants herein, had no authority to select the personnel of the workmen, nor did they have the right to discharge any person who was sent there. Of course, they could appeal to the proper authorities for the assignment or discharge of certain employees, but the granting of their requests was left entirely to the discretion of those to whom the appeal was made. It is true that the official CWA bulletin, which pertained to and governed the project, required the sponsors to pay for the services of architects, engineers, rodmen, superintendents, inspectors, and all other professional services, and that in connection with the work, the Fair actually employed, compensated, and enjoyed the use of an architect, several engineers, and a superintendent. Also, we are satisfied that these Fair employees, and particularly Mr. W. A. Hirsch, secretary-manager of the Fair, cooperated and worked with the project superintendent and labor foremen by making numerous suggestions and requests regarding the details and methods of the work. Furthermore, it was within the province and power of the sponsors to cause a cessation of the work at any time that they so desired. But notwithstanding all of this, there was not present the principal element essential to warrant and cause the application here of the master and servant doctrine, viz., the element of control by the sponsors over the CWA workmen. In the light of the peculiar facts revealed by the record in this case and the above-quoted provisions of law, we must hold that the workmen were not employees or servants of either the City or Fair, and that neither defendant is liable to plaintiff under the respondeat superior doctrine.

The Supreme Court of Nevada, in the comparatively recent case of State ex rel. State Board of Charities and Public Welfare v. Nevada Industrial Commission, 55 Nev. 343, 34 P.(2d) 408, held that:

"The state, counties, school districts, and the municipal corporations thereof, where federal emergency relief work is carried on, are not employers within the meaning of the term 'employers' as used and defined in the Nevada Industrial Insurance Act, and the persons placed at work upon such projects are not employees within the meaning of the term 'employees' as defined and used in the Nevada Industrial Insurance Act."

█ Another of plaintiff's contentions, and one in which we find much merit, is that the City is liable to plaintiff irrespective of the relation existing between it, the Fair, and the CWA. It is to be recalled that the Machinery Building and the entire fairgrounds, including the sidewalk and street in front of and adjacent to the building, were owned by the defendant city. The street and sidewalk were at all times available and employed for public use, and were constantly used for vehicular and pedestrian travel, respectively. Just prior to the accident, both of these ways were so employed. On the morning of February 28, 1934, the motortruck conveying the construction crew was stopped and parked in the street across from and in front of the Machinery Building. After alighting from the vehicle, Todaro walked over to and in front of the building and stood on the sidewalk beneath the canopy. It was shortly after reaching such location, and while standing there, that the canopy or overhanging roof fell and completely bisected that way of passage and injured plaintiff. As previously stated, we are satisfied that no guard rails or barricades were there present to warn persons of the impending and lurking danger afforded by the defective front wall.

As we view the found facts in connection with the settled law applicable thereto, it is our opinion that a duty rested on the City to keep the sidewalk, on which Todaro was standing, safe for pedestrian travel, or to take proper precautions during the progress of the work to prevent injury; and on failure to do so, it is liable for all consequential damage. And this is true, even though it might be conceded arguendo that the relation of employer and independent contractor existed between the City and the CWA, and even though ownership and maintenance

of the fairgrounds as a park was in the exercise of a governmental function.

█ Ordinarily, and as a general rule, where the relation between the municipality and the contractor is clearly that of employer and independent contractor, the municipality is not liable for injuries caused by the negligence or wrongful acts of such contractor in doing the work. 43 Corpus Juris, verbo Municipal Corporations, § 1722; La Groue v. City of New Orleans, 114 La. 253, 38 So. 160, 161. But an exception to this general rule is that a municipal corporation on which there rests a positive legal duty cannot free itself from responsibility by delegating such duty to an independent contractor, and it will be liable for the negligence of such contractor in the performance of the work. Elias v. City of New Iberia, 137 La. 691, 69 So. 141, 144. The liability of the municipality in the case of nondelegable duties is especially applicable where injuries are caused by acts of contractors in performing work requiring obstructions in public ways of passage. 43 Corpus Juris, verbo Municipal Corporations, § 1725.

In 43 Corpus Juris, verbo Municipal Corporations, § 1726, we find:

"Under the rule sustained by the great weight of authority the duty of a municipality to keep its streets in a reasonably safe condition for travel cannot be delegated; and if a contractor, in the performance of a contract for the construction of sewers or other improvements in the streets, makes excavations or creates other obstructions in a street, the municipality will be liable for any injury sustained by reason of a failure to safeguard the public by barriers and lights, or otherwise, unless exempted from liability by a valid statute; and the municipality cannot protect itself in this regard by stipulations requiring the contractor to take proper precautions."

The case of Morris v. Salt Lake City, 35 Utah, 474, 101 P. 373, is authority for the proposition that the City is liable for the acts of an independent contractor, employed by it to lay a sidewalk, who cut the roots of trees standing in the public street, depriving them of their support, and thereafter the trees were blown down and against the dwelling of the abutting owner, causing damage.

In the case of La Groue v. City of New Orleans, supra, the writer of the opinion quotes approvingly from Dillon on Municipal Corporations, as follows:

" 'Accordingly the later and better considered cases in this country respecting streets have firmly, and, in our opinion, reasonably, established the doctrine that, where the work contracted for necessarily constitutes an obstruction or defect in the street, of such a nature as to render it unsafe or dangerous for the purposes of public travel unless properly guarded or protected, the employer (equally with the contractor), where the injury results directly from the acts which the contractor engaged to perform, is liable therefor to the injured party.' Id. 1030."

We are cognizant of the fact that the situation with which we are confronted does not involve a street or an excavation in a street similar to that referred to in the foregoing quoted passages. It does involve, however, an imminently dangerous instrumentality of concrete and brick, seemingly securely, but actually insecurely, attached to a building, treacherously overhanging a public sidewalk, all of which was the property of the City. As we view it, the situation presented here is equally as perilous, if not more so, as the described street excavation, and the canopy, in its insecure condition, could certainly be placed in the category of an obstruction.

The following is said in the case of Burke v. Werlein, 143 La. 788, 792, 79 So. 405, 406, with reference to excavations in sidewalks:

"The authorities are practically unanimous to the effect that an excavation in a public sidewalk is intrinsically dangerous, and is a nuisance; that one who causes it to be made, equally with the one who makes it, owes the absolute duty to protect the public from injury that may result therefrom; and that the one who causes it to be made cannot escape liability for such injury by showing that the one who has made it was engaged so to do as an independent contractor.

" 'The general rule,' says Judge Dillon, referring to the rule that the principle of respondeat superior does not * * * extend to cases of independent contracts, where the party for whom the work is done is not the immediate superior of those guilty of the wrongful acts and has no choice in the selection of workmen and no control over the manner of doing the work under the contracts, 'is stated in the preceding section, but it is important to bear in mind that it does not apply where the contract directly requires the performance of a work intrinsically dangerous however skillfully performed. In such a case the party authorizing such a work is justly regarded as the author of the mischief resulting from it whether he does the work himself or lets it out by contract.' Dill.Mun.Corp.(4th Ed.) vol. 2, § 1029."

Referring to the duty of municipal corporations to keep their sidewalks in a safe condition, the Supreme Court, in the case of Lemoine v. City of Alexandria, 151 La. 562, 92 So. 58, 59, said:

"Municipal corporations owe it to the public to keep the sidewalks in such a condition that pedestrians who are ordinarily careful will not be exposed to injury. The right of the citizen to recover damages for injuries sustained by reason of the failure of the municipal corporation to discharge the mandatory duty thus imposed on it is beyond question. Dillon, Munic.Corp.(4th Ed.) p. 887, § 735, page 1203, § 980, and page 1284, § 1020; Buswell's Law of Personal Injuries, §§ 53, 167; Lorenz v. City of New Orleans, 114 La. 802, 38 So. 566; Weinhardt v. City of New Orleans, 125 La. 351, 51 So. 286; Gueble v. Town of Lafayette, 121 La. 909, 46 So. 917; McCormack v. Robin, 126 La. [594] 598, 52 So. 779, 139 Am.St.Rep. 549."

Regarding the liability of a city, where the duty of keeping its streets or sidewalks in a safe condition is a governmental one, the opinion in the case of Howard v. City of New Orleans, 159 La. 443, 105 So. 443, 444, cites numerous cases and then expounds a generally recognized applicable doctrine as follows:

"The rulings in these cases are correct. They are in accordance with what may be said to be the universally recognized principle that a municipality is liable for negligence in failing to keep its streets and sidewalks in repair, or in reasonably safe condition for travel. While the duty of a municipality to keep its streets and sidewalks in safe condition may be said to be a governmental duty, yet the rule that makes it liable for negligence in failing to exercise the governmental function of keeping them in repair is an exception to the rule above stated, to the effect that a municipality is not liable in damages for failure to exercise a governmental function, intrusted to it, or for the negligence of its agents in exercising it, and, being an exception to the rule, necessarily does not overthrow the rule. Schwalk v. City of Louisville, 135 Ky. 570, 122 S.W. 860, 25 L.R.A.(N.S.) 88; Snider v. City of St. Paul, 51 Minn. 466, 53 N.W. 763, 18 L. L.A. 151."

■ It might be argued that the City is not liable for the injuries resulting from the dangerous condition of the wall on the ground that proper notice of such condition was not furnished to it. This argument would be unavailing. The notice which is required in order to charge a municipal corporation with knowledge of defects or obstructions in its streets or sidewalks may be express or implied, actual or constructive. 43 Corpus Juris, verbo Municipal Corporations, § 1821. The following is stated in 43 Corpus Juris, verbo Municipal Corporations, § 1820:

"Municipal corporations are chargeable with knowledge of their own acts, or those ordered by them; and therefore whenever defective conditions in streets are due to the direct act of the municipality itself, or of persons whose acts are constructively its own, as where work is done under contract with the municipality, or, as held in some cases, where the defect is created by persons acting under a license or permit from the municipality, no notice need be shown, or, as it is otherwise stated, notice of the defect is necessarily implied in such cases."

■ In this case the City joined in and executed the necessary application for the undertaking of the CWA project, and one of the items of that project provided for the demolition of the Machinery Building which was owned by the City and bordered on the sidewalk. Having specifically authorized this work, the City is at least chargeable with constructive knowledge of the dangerous situation created and presented through the medium of the defective front wall.

The evidence does not preponderate in favor of the proposition that plaintiff was injured by reason of the alleged negligence of his fellow servant, Ed Brooks, as urged by one of the defendants. It is possible that Brooks touched the guy wire which was embedded in the building; although there is much testimony in the record that the wire could not have been reached by him except by reason of his climbing a ladder, and further that he did not venture from the ground. In all events, we think that the collapse of the canopy was not caused by any act of this fellow servant.

■ Another defense urged by defendants is that of contributory negligence on the part of plaintiff. This, in our opinion, is likewise without merit. The evidence discloses that on the morning of and for several days prior to the accident, various persons had passed along the sidewalk beneath the canopy. There is no doubt that the tearing down of the rear portion of the building was observable by persons approaching the front or using the sidewalk, because of the open arches in the wall, but there was nothing to indicate that a hidden defect existed in the front wall and that the canopy was not properly supported. The Supreme Court, in Elias v. City of New Iberia, supra, stated:

"This lifting of the clothesline is pleaded as constituting contributory negligence on the part of the person who did it, for whose act plaintiff is responsible. But a person who incurs a danger hidden and unknown, and which he or she was under no obligation to have knowledge of, cannot, in the nature of things, be said to have been negligent. Clements v. La. Electric Light Co., 44 La. Ann. 692, 11 So. 51, 16 L.R.A. 43, 32 Am. St.Rep. 348; 29 Cyc. 430."

Another contention of the Fair is that there can be no liability on its part for the reason that it is a non-profit or charitable corporation, operated for the benefit of the citizens of Shreveport, and vicinity, of which plaintiff is one. Having determined that the respondeat superior doctrine is not applicable to this case, and there being no other theory under which the Fair might be held responsible, it becomes unnecessary for us to discuss this contention.

■ The final question to be determined is the one regarding the quantum to which plaintiff is entitled. Todaro's body, from his chest to his feet, inclusive, was covered with and struck by brick, mortar, and other heavy materials which made up the falling canopy. Numerous lacerations, bruises, and broken bones resulted from the accident. For approximately four days he was unconscious. He was in the operating room several hours, and his stay in the sanitarium was for a period of two months and five days. During that time he was given much opiate to alleviate his pain and suffering. The attending physician, who testified as a witness for the defense, was, for about a week after the accident, uncertain as to whether or not he would live.

The bone injuries were numerous, and the fractures were major in character. There was a fracture of the left femur extending from the middle portion of the greater trochanter downward and inward to about three inches below the lesser trochanter. A radiographic examination, however, made more than a year later, disclosed that the

fragments of that bone had then formed in proper position and the union was apparently complete. Also, plaintiff experienced a complete fracture of the tibia and fibula of the right lower leg. The tibia, or larger of the two bones, was broken about four inches above the ankle. A good union resulted, but there remained a slight bowing or angulation outward of it. The fibula was fractured about the same distance above the ankle. The union of this was incomplete, the upper fragment being slightly displaced forward and the lower fragment downward. At the time of the trial, which commenced approximately fifteen months after the accident, there was still an open wound on the lower right leg which was discharging. Medical testimony attributed this to the existence there of some dead bone. Plaintiff's left foot received a comminuted fracture, consisting of the crushing of three metatarsal and four tarsal bones therein. Some of these bones were broken in several places, and there were approximately twelve breaks in all. In addition to the above, the record discloses that the left leg was rendered almost one and one-half inches shorter than the corresponding leg.

After his removal from the sanitarium, Todaro was taken to his home where he lay in bed on his back for more than six weeks, his legs being in a cast during that period. Thereafter he occupied and used a wheel chair for three or four months, and was then permitted the use of crutches. When the case was tried he was able to walk to a limited extent with the aid of a cane.

Plaintiff, when the accident occurred, was 27 years of age, and had a life expectancy, according to the American mortality table, of 37.43 years. He was earning $57.50 for his work of fifteen days in each month. For approximately nine years, he had been an employee of the Southwestern Gas & Electric Company in the capacity of a driver and helper, and during a portion of that time he had earned as much as $155 per month. No office work had ever been performed by him. Before receiving his injuries, he was strong, robust, and healthy, was an athlete in that he enjoyed and engaged in playing baseball with a local team, and could properly and ably discharge the duties of his employment which required, in many instances, much physical strength and endurance.

The evidence is conclusive that Todaro suffered extreme and intensive pain for a long period of time. He was a co-operative patient, and under no circumstances could he be classed as a malingerer. We are satisfied that he will never outlive the effects of the accident, and it is doubtful that he will again be able to perform manual labor.

By reason of the permanency of plaintiff's injuries, and the pain and suffering which he experienced, he is entitled to a sizable award. No case in our Louisiana jurisprudence sustaining the quantum fixed by the jury in the trial court has been called to our attention, and we know of none, and we must hold such amount to be somewhat excessive. It is our belief that an award of $15,000 will be proper and reasonable and in line with the established jurisprudence of Louisiana involving injuries and suffering of similar import.

The verdict of the jury and judgment of the trial court directing payment to intervener, plaintiff's employer, Southwestern Gas & Electric Company, Incorporated, are authorized by the Workmen's Compensation Law of this state (Act No. 20 of 1914, as amended), and are therefore correct.

For the foregoing reasons, it is ordered, adjudged, and decreed that plaintiff's judgment against the State Fair of Louisiana is reversed and his suit dismissed; that his judgment against the city of Shreveport is amended by reducing the recited quantum to $15,000, and, as amended, it is affirmed; that the judgment in favor of intervener, Southwestern Gas & Electric Company, Incorporated, is amended by rejecting its demands as against the State Fair of Louisiana, and, as amended, it is affirmed.

Costs of both courts shall be paid by defendant city of Shreveport.