JONES et al. v. GEORGE F. GETTY
OIL CO.

No. 1525.

Circuit Court of Appeals, Tenth Circuit.
Sept. 7, 1937.

Rehearing Denied Oct. 18, 1937.

256

Jarrell Garonzik, of Dallas, Tex. (R. Guy Carter and John Gray, both of Dallas, Tex., and John R. Brand, of Hobbs, N. M., on the brief), for appellants.

Carl H. Gilbert, of Sante Fé, N. M. (M. W. Hamilton, of Sante Fé, N. M., and James W. Stagner and George L. Reese, Jr., both of Carlsbad, N. M., on the brief), for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

Appellant Frank D. Jones commenced this action, as plaintiff, against appellee, Getty Oil Company, as defendant, to recover damages for personal injury. His co-appellant, Associated Indemnity Corporation, having intervened, filed its amended plea in intervention for subrogation.

The parties will be herein referred to as they appeared in the lower court, to wit: Frank D. Jones, as plaintiff; Associated Indemnity Corporation, as intervener; and George F. Getty Oil Company, as defendant.

Plaintiff individually and for use of intervener in his petition declared that about six weeks prior to the occurrence of plaintiff's injury on April 8, 1934, he entered into an oral contract of employment in the State of Texas with E. C. Norwood whereby he agreed and did go to the State of New Mexico to work for Norwood on an oil and gas lease in that state.

Defendant then and there owned, operated, and maintained and controlled a 40-acre tract of oil land upon which it then did and does now maintain numerous oil wells and three water wells, and entered into a contract with the said E. C. Norwood to sell him certain quantities of water for said Norwood's drilling · operations. On said date, the three water wells having become out of repair, ceased to pump water, the said Norwood thereby being prevented from continuing such operations in drilling oil wells, no other source for obtaining water for such operation being available. In order to repair said wells so that water could be obtained by Norwood, and his drilling operations resumed, the said E. C. Norwood, acting by and through his agent, servant, and employee, Bill Wood, the foreman in charge of said drilling operations, in the regular scope and course of his employment, ordered and instructed the plaintiff Frank D. Jones and other employees to proceed with him (Bill Wood) upon the premises of defendant and to said water well No. 1, and to perform certain work designated by Bill Wood in the repair of said wells. Such voluntary entry was made upon the premises by Bill Wood and his crew, including plaintiff, with the consent of the defendant, acting by and through its lease superintendent, Allen Stewart, who was in charge of the defendant's premises and acting in the regular scope of his employment for the defendant. Plaintiff came upon said premises at about 6 p. m. on said date, and, pursuant to instructions from the foreman of his employer, E. C. Norwood, and while acting within the regular scope and course of his employment for said employer, and none other, within the meaning of the Employers' Liability Act of the State of Texas, (Rev.St.Tex.1925, art. 8306 et seq., as amended, Vernon's Ann.Civ.St.Tex. art. 8306 et seq.), and the Workmen's Compensation Law of the State of New Mexico (Comp.St.N.M.1929, § 156–101 et seq. as amended) as well as at common law, took the block in question and climbed the gin

pole and attached the block to the top thereof, and plaintiff then descended and took the winchline and again climbed the pole for the purpose of feeding said line through the block, in order that the rods might be pulled from the well, and at the time the plaintiff came upon said premises, the gin pole and wires had just been moved and erected and the guy wires had just been tied to the "dead men" and drawn taut by the agents, servants, or employees of the defendant.

"In the performance by the plaintiff of the work above set forth and at all times while he was upon the premises of the defendant and elsewhere at the time and on the occasion in question, he was acting in all things under the direction, supervision, and control of his employer, E. C. Norwood, and none other, and Bill Wood was also so acting, and * * * at no time in the performance of said work nor while he was upon the defendant's premises or elsewhere, was the plaintiff in any manner or as to any matter acting under the direction, supervision or control of the defendant, its agents, servants or employees; nor did plaintiff at any time or in any manner in the performance of said work, or while upon defendant's premises or elsewhere, submit himself to the direction, supervision or control of the defendant, its agents, servants or employees; the defendant, its agents, servants or employees, including B. M. Evans, Allen Stewart and S. A. Burke were not in any way nor in any manner acting under the direction, supervision or control of E. C. Norwood, his agents, servants or employees in the repair of said wells at the time and on the occasion in question; the said Allen Stewart and his crew of men and the said Bill Wood and his crew of men, including the plaintiff, were each acting separately and independently of the other and were furthering the interest of and acting on behalf of their respective employers, George F. Getty Oil Company and E. C. Norwood."

" * * * At the time and on the occasion in question the defendant, its agents, servants or employees, was guilty of negligence which directly and proximately caused the injuries complained of, and the negligent acts of the defendant's servants occurred, while said servants were acting in the regular scope of their employment for the defendant."

Further allegation is that the said E. C. Norwood was eligible to become and was a subscriber under the terms of what is known as the Workmen's Compensation Act of the State of Texas at the time such contract of employment was entered into and at all times thereafter, and that said employer, at the time plaintiff's injuries were sustained, had in his employ more than three employees and that he did not come within any of the exceptions set forth in section 2 of article 8306 of said act, found in the Revised Statutes of Texas for the year 1925; that on the date that said contract of employment was entered into and on the date that plaintiff's injuries were sustained, the said Norwood carried a policy of workmen's compensation insurance with the Associated Indemnity Corporation (intervener), and that after such injuries were sustained plaintiff elected to take compensation pursuant to the terms and provisions of the Workmen's Compensation Act of Texas, and that thereafter the Associated Indemnity Corporation (intervener) agreed, promised, assumed to pay, and did pay, compensation pursuant to the terms and provisions of the Workmen's Compensation Act of Texas in the sum of $3,465; that in addition thereto the Associated Indemnity Corporation (intervener) has paid medical expenses incident to and in connection with the treatment of the plaintiff herein on account of said injuries in the further sum of $67.50, which medical services were necessary, and that such prices charged therefor were reasonable, all of which said sums in the total amount of $3,532.50, the said Associated Indemnity Corporation (intervener) has expended in connection with the compensation claim made by plaintiff against it, for which amount the Associated Indemnity Corporation (intervener) has been finally held liable to the plaintiff herein, and that the claim made by the plaintiff herein against the Associated Indemnity Corporation (intervener) before the Industrial Accident Board of the State of Texas has been finally determined and disposed of.

Intervener in its amended petition claims subrogation in sum of $3,532.50 out of recovery by plaintiff.

The amended complaint is silent as to what arrangements were made between Norwood's representative and his crew on the one side, and the defendant on the other, with respect to the work to be done by Norwood's crew; it merely reciting that such crew came on the property with the defendant's consent.

Immediately after Norwood's crew came on the work, Norwood's foreman directed plaintiff to climb the "gin pole," attach a block to the top thereof, and·feed a pulley through the block. Plaintiff was standing near the top of the pole, pursuant to the aforesaid order, when a guy wire broke, allowing the pole to fall, injuring the plaintiff; it being alleged that the guy wire was broken through negligence of certain of defendant's employees.

There is no allegation negativing defendant's power to control the work or allegation that Norwood's crew took charge of the work.

■■■ If plaintiff was a temporary employee of defendant, then the latter's sole liability to him is under the New Mexico Compensation Act; no common-law liability having application. The work being done was defendant's work. Norwood's act constituted a loan of his employees to defendant to assist, plaintiff being a temporary employee of defendant. If Norwood's men were mere volunteers, no common-law liability attached. The only duties under such circumstances owing by defendant to plaintiff was not to willfully or wantonly injure him or expose him to hidden peril. 45 C.J. p. 796; p. 788, § 194.

■■■ The right of the intervener depends upon the claim of the plaintiff. If the latter has no claim, the intervention necessarily fails.

Allegation of plaintiff's status as a special employee of defendant ·is lacking, but applicability of the New Mexico Workmen's Compensation Act to plaintiff's status as disclosed by pleadings is apparent. For if plaintiff occupied position of special employee of defendant he was within the scope of the New Mexico Workmen's Compensation Act, and not permitted to maintain an action as under the common law for damages.

■■■ The complaint characterized the defendant as a corporation engaged in carrying on for the purpose of business, trade, or gain within the state of New Mexico "The extra-hazardous occupation or pursuit" of operating oil wells and also water works, with no affirmative allegation that the defendant was employing as many as four workmen, but alleging that at the time of the accident the plaintiff at or near the top of the "gin pole" "was borne down the distance of approximately 35 feet from above the ground." Plaintiff, as a workman, was within the New Mexico statu-

tory provision that: "If any such injury so occurs to any such workman in such service while at work upon any * * * pole * * * ten feet or more above the surface of the ground, this Act shall apply without regard to the number of workmen employed at the time." (Chapter 178, Laws 1933.)

A "workman" is defined by the act as: "Any person who has entered into the employment of or works under contract of service or apprenticeship, with an employer," except casual employees who are not engaged in the employer's regular trade or business. "The term 'workman' shall include 'employee.'" Section 156-112(i), New Mexico Statutes Annotated, Comp. 1929.

■■■ Relief afforded under the New Mexico Compensation Act is as follows: "This act shall be construed as creating a new right and special procedure for the enforcement of the same, and the rights and remedies provided in this act for workmen and their dependents coming under the terms hereof, on account of injuries suffered by accident arising out of and in the course of the employment of such workman, shall be exclusive of all other rights and remedies of such workman, his personal representatives or dependent family, next of kin and all other persons, at common law or otherwise." Section 156-105 New Mexico Stats.Ann.1929 Compilation.

The New Mexico Compensation Act, however, appears to extend its protection to persons other than employees. Section 156-112 (o) N.M.Stats.Ann.Comp.1929 is as follows: "Where any employer procures any work to be done wholly or in part for him, by a contractor other than an independent contractor, and the work so procured to be done is a part or process in the trade or business or undertaking of such employer, then such employer shall be liable to pay all compensation under this act to the same extent as if the work were done without the intervention of such contractor. And the work so procured to be done shall not be construed to be 'casual employment.'"

This was evidently intended to extend the protection of the compensation act to persons not employees at common law. Such persons, however, are expressly within the terms of the New Mexico Compensation Act.

■■■ The purpose of compensation acts is to avoid uncertainty in litigation and of

assuring injured workmen and their dependents a prompt payment of compensation, and this section seems to promote such purpose. Burruss v. B. M. C. Logging Co., 38 N.M. 254, 31 P.(2d) 263; Purkable v. Greenland Oil Company, 122 Kan. 720, 253 P. 219; Qualp v. James Stewart Co., 266 Pa. 502, 109 A. 780; Wisinger v. White Oil Corporation (C.C.A.) 24 F.(2d) 101; Central Trust Company v. Tex. & St. L. Ry. Co. (C.C.) 32 F. 448.

As to the complaint not negativing the plaintiff's status as a special employee of the defendant, in cases where a third person having sued the general employer for injuries arising from the negligence of his employee, such general employer defending on the ground that such negligent employee was, at the time, in the special employ of another person, in order for the defense to prevail, the general employer must not only show that the workman was in the special employ of another, but also that such workman's status as a general employee of the defendant had temporarily ceased and negative the fact that the employee was the servant of both employers at the time of the accident. In such cases the courts are much more strict in their requirement as to the showing of relinquishment of control of the employee by the general employer and as to a lack of direct interest of the general employer in the work, than in cases such as where the inquiry merely involves the applicability of the Workmen's Compensation Act to the relation between the injured workman and one who is claimed to have been his special employer. It frequently appears that the workman will be held to have been at the same time the general employee of his regular employer and the special employee of the person whose work is being done.

The federal rules seem to be definitely established in that respect.

In McLamb v. E. I. DuPont de Nemours & Co. (C.C.A. 4) 79 F.(2d) 966, it is held: "One may be in general service of another, and yet with respect to particular work may be transferred with his own consent to the service of third person, so that he becomes servant of such person with all legal consequences of new relation."

Plaintiff and Wood, employees of said E. C. Norwood, voluntarily entered upon the premises where said well was located to do certain work, plaintiff having so been directed "with the consent of the defendant" acting by and through defendant's lease superintendent, Allen Stewart, who was in charge of defendant's premises and acting in the regular scope of his employment for the defendant at the time the plaintiff came upon said premises, the gin pole and wires just having been moved and erected and the guy wires just been tied to the "dead men" and drawn taut by the agents, servants, or employees of the defendant; defendant's lease superintendent being then and there in charge and control; the defendant, its agents, servants, or employees, including B. M. Evans, Allen Stewart, and S. A. Burke not in any way nor in any manner acting under the direction, supervision or control of E. C. Norwood, his agents, servants, or employees in the repair of said wells at the time and on the occasion in question; the said Allen Stewart and his crew of men and the said Bill Wood and his crew of men, including the plaintiff, each acting separately and independently of the other and furthering the interest of and acting on behalf of their respective employers, George F. Getty Oil Company and E. C. Norwood.

In Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 255, 53 L.Ed. 480, the following is quoted with approval from Murray v. Currie, L.R. 6 C.P. 24: "But I apprehend it to be a true principle of law that, if I lend my servant to a contractor, who is to have the sole control and superintendence of the work contracted for, the independent contractor is alone liable for any wrongful act done by the servant while so employed. The servant is doing, not my work, but the work of the independent contractor," and also quoted with approval from Higgins v. W. U. Tel. Co., 156 N.Y. 75, 50 N.E. 500, 66 Am.St.Rep. 537: "The question is whether, at the time of the accident, he was engaged in doing the defendant's work or the work of the contractor. * * * The master is the person in whose business he is engaged at the time, and who has the right to control and direct his conduct."

The controlling factor is: For whom is the work being performed, and who had the power to control the work and the employee? The authority to determine the work to be done, and the manner in which it is to be carried on, necessarily includes the right to suspend or terminate the work altogether or, possibly, to exclude the particular employee from the job, not includ-

ing the right to discharge the employee from the service of his general employer (Norwood), nor need it include the actual giving of directions to the employee in connection with the work he is doing.

Bill Wood, the foreman, and plaintiff, and the other members of Norwood's crew, had voluntarily entered upon said premises in said work with the consent of said defendant, who was the owner and in control, through his lease superintendent, Allen Stewart.

In Linstead v. C. & O. R. Co., 276 U.S. 28, 48 S.Ct. 241, 243, 72 L.Ed. 453, the question for determination was liability under the Workmen's Compensation Act of the company which was claimed to be the special employer of the injured workman. In that case, the railroad lines met at Cincinnati, so that when through freight was interchanged between the two lines Cincinnati was always designated as the point to which the freight was to be hauled by the initial carrier, and such initial carrier was responsible for the transportation of the freight to that point. However, the terminal yards of both companies were some miles out of the city, that of the C. & O. at Stevens, Kentucky, some twelve miles before its lines reached Cincinnati, and that of the Big Four being on the opposite side of Cincinnati. Under such conditions, in order that the exchange of freight could be made at one or the other of the terminal yards, a reciprocal understanding had grown up between the two lines under which the one which was to receive the freight from the initial carrier would send its engine and crew to the delivering (C. & O.) carrier's terminal and there pick up the freight and transport it over the delivering carrier's tracks to Cincinnati, and out over its own line to its point of destination. The technical result of such arrangement was that the receiving carrier (Big Four) completed the haul into Cincinnati for which the delivering (C. & O.) carrier was paid and was responsible, neither carrier paid anything to the other for the service so rendered, and the respective train crews, while engaged in such service, were paid only by the line which employed them generally.

Linstead, in the general employ of the Big Four railroad, proceeded with a Big Four crew and engine over the C. & O. line to Stevens, Kentucky, where they picked up a string of freight cars and started back with them to Cincinnati.

While still on the C. & O. tracks, Linstead was killed in a wreck. The evidence showed that while the Big Four crew operated on the C. & O. tracks it was supposed to comply with the operating rules of that railroad, and to operate so as not to conflict with C. & O. timetables and in accordance with instructions from that company's trainmaster. Aside from the necessary co-operation mentioned above, the detailed handling of the train was under the immediate direction and control of the Big Four employees; no C. & O. train man being on the train. Neither Linstead nor any member of the crew was paid by the C. & O. or subject to being discharged by that company. Linstead's executrix brought suit against the C. & O. under the Federal Employers' Liability Act (45 U.S.C.A. §§ 51–59), claiming that the circumstances made Linstead a special employee of the C. & O. at the time of the wreck, and there, as here, the identity of the employer and its consequent liability under a compensation act was the ultimate issue. There, as here, the injured person was under the general employ of another and was merely temporarily doing the work of the defendant. There, as here, the work so being done was primarily for the purpose of benefitting the general employer. There, as here, no payment to the general employer was made or contemplated for the doing of the work in question by its employees, and no payment of wages to the loaned employee was made or contemplated by the company whose work he was doing. There, as here, however, the work in which the employee was engaged at the time of the injury was a part of the defendant's regular business. The general power of control and supervision of the work was in the defendant, although the injured employee was under the immediate supervision of the general employer and was only subject to being discharged by his general employer.

In the Linstead Case, the following excerpt was quoted with approval from Standard Oil Company v. Anderson, supra: "Now the work which was being done here by Linstead and his crew was the work of the Chesapeake & Ohio Railway. It was the transportation of cars, loaded and empty, on the Chesapeake & Ohio Railway between Stevens and Cincinnati. It was work for which the Chesapeake & Ohio road was paid according to the tariff approved by the Interstate Commerce Commission; it was work done under the

rules adopted by the Chesapeake & Ohio Railway Company; and it was done under the immediate supervision and direction of the trainmaster in charge of the trains running from Stevens to Cincinnati, and that trainmaster was a superior employee of the Chesapeake & Ohio road. We do not think that the fact that the Big Four road paid the wages of Linstead and his crew, or that they could only be discharged or suspended by the Big Four, prevented their being the servants of the Chesapeake & Ohio Company for the performance of this particular job."

As in the instant case, the C. & O. had no power to suspend or discharge the employee in question, but the court held that fact to be immaterial. The court points out that the work was done under the rules adopted by the defendant railroad company and under the supervision of its trainmaster. Such compliance with a railroad's operating regulations and such regulation of the movement of the trains by the company's trainmaster were, of course, necessary in all cases where one company operates its trains over another's line, but they are not, however, of any great weight in the determination of whether the employees of the company, which is operating such a train, become also the special employees of the company over whose lines such operations are being carried on. This is apparent from a comparison of the case of Linstead v. C. & O. R. Company, supra (decided in 1928), with the case of Hull v. Philadelphia & Reading Railroad Company, 252 U.S. 475, 40 S.Ct. 358, 64 L.Ed. 670 (decided in 1920), where, under exactly the same conditions with respect to the control of the trains as were present in the Linstead Case, the court found that the train crew did not become the special employee of the company over whose tracks the train was being operated.

Hull, while in the employ of Western Maryland Railroad Company, was operating that company's train over the Philadelphia & Reading tracks at the time of the accident. The lines of the Western Maryland Railroad Company ran from Hagerstown, Md., to Lurgan, Pa., where they connected with the defendant's line to Rutherford, Pa. A contract had been entered into between the two companies under which each company ran through trains between Hagerstown and Rutherford, using the other company's tracks insofar as was necessary to such operation.

The contract specifically provided that when one company's train was operating over the other's tracks its crew should conform to the rules of the company over whose tracks it was so operating and should be subject to the orders of such company: "The employees of each company while upon the tracks of the other shall be subject to and conform to the rules, regulations, discipline and orders of the owning company."

At time of the accident, the Western Maryland Railroad Company's crew was picking up freight cars from a Philadelphia & Reading Railroad Company siding, pursuant to the direct order of the latter company's trainmaster, and the train was being operated on the Philadelphia & Reading Railroad Company's lines. The same control was exercised by the defendant railroad company in Hull v. Philadelphia & Reading Railroad Company as in the case of Linstead v. C. & O. R. Company. The Supreme Court, however, came to directly the opposite conclusions in the two decisions, holding that in the Hull Case the plaintiff had not become the special employee of the company over whose tracks the train was being operated, and in the Linstead Case that he had become such special employee. The determining factor, therefore, is not the question of control over the employee, for that was the same in both cases, but as stated in Standard Oil Company v. Anderson, supra, it is a question of whose work was being done. In the Hull Case the plaintiff's intestate was operating a train of his general employer, pursuant to his general employer's obligations with its shippers. It was, therefore, his general employer's work which was being done and he was held to remain that company's employee. In the Linstead Case the plaintiff's intestate, a general employee of the Big Four Railroad, was carrying on an operation which the C. & O. Company had undertaken to perform. The work he was performing was therefore the work of the C. & O. and the court held that in so doing he became that company's special employee.

In Linstead v. C. & O. Railroad Company, supra, it is said, quoting from Hull v. Philadelphia & R. R. Co., supra: "By arrangement between the two companies, through freight trains were operated from Hagerstown to Rutherford, one half over one line, and one half over the other, and each company ran its own locomotives and freight trains over the United line from

Hagerstown to Rutherford, observing the rules of each company on its respective line. It was held that Hull was not a servant of the Philadelphia & Reading Company by which he was killed, but only the servant of the Western Maryland Company. That was because the work which Hull was doing was the work of the Western Maryland Company, even though it was carried on for a part of the way over the rails of the Philadelphia & Reading Company. The locomotive belonged to the Western Maryland Company, the cars belonged to the Western Maryland Company, and the loads that were carried were being carried for the Western Maryland Company, and presumably the rates which were received for the transportation were the receipts of the Western Maryland Company."

In McLamb v. E. I. DuPont de Nemours & Co., supra, the government, in the course of dredging operations, called in expert employees of the defendant company to advise as to the use of explosives in connection with the work. At request of the engineer in charge of the work the defendant's employees took entire charge of the blasting operations and in that connection controlled and directed the workmen who did the blasting. The plaintiff as such a workman was injured while carrying on such operations under the immediate direction and control of the defendant's experts. He sued the DuPont Company, claiming to have been its special employee at the time of the accident, and based his case on the theory that he had not been furnished a safe place in which to work. The defendant company, on the other hand, contended that its experts became the special employees of the government and were acting in that capacity at the time of the accident. After quoting from the case of Anderson v. Standard Oil Company, supra, the court in McLamb v. DuPont Co. said: "The question is whether, under the facts of the pending case, it is correct to say that the DuPont Company furnished its employees to the United States and placed them under its control in the performance of the work; or whether, on the other hand the company undertook to do the work through its own servants, retaining direction and control over them. Obviously this question cannot be answered, as the plaintiff seeks to do, by pointing out that the army engineer, after deciding to use explosives, authorized the DuPont representatives to tell the laborers what they should do, and how they should do it, for a superintendent or foreman usually has this authority over laborers and yet does not become thereby an independent contractor; nor do the laborers cease to be servants of their common employer. *The determining factors here are that the work was the work of the United States, and that control over it was never relinquished by the army engineer in charge."* (Italics mine)

Quoting from Singer Mfg. Co. v. Rahn, 132 U.S. 518, 523, 10 S.Ct. 175, 176, 33 L. Ed. 440, the court in McLamb v. DuPont Co. further said:

"The relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, 'not only what shall be done, but how it shall be done.'

"Viewed in this light, it is clear that the laborers did not become the servants of the DuPont Company, but the experts furnished by that company became for the time being the servants of the United States. It is true that the engineer sought and obtained the advice of the DuPont Company as to whether explosives should be used; but the final decision in the matter was made by him. Likewise, the instruction and direction of the men in the use of the dangerous substance was left to the experts; but the control of the undertaking was never relinquished by the United States. The engineer at any time could have withdrawn the laborers and abandoned the use of explosives, or could have changed the methods employed. The fact that he refrained from interfering does not indicate a lack of power on his part; nor does the fact that the DuPont Company furnished the experts, doubtless with the hope and expectation of selling its products to the United States, indicate that it had assumed control of the dredging operation, or become responsible for its results. * * * The facts of the case constitute a clear example of the sort often before the courts in which one person puts his servant at the disposal of another for the performance of a particular service for the latter, whereupon the servant, in respect of its acts in that service, is to be dealt with as the servant of the latter and not the former, so that the latter, and not the former, is liable for the servant's torts. See Linstead v. Chesapeake & O.

Ry. Co., 276 U.S. 28, 48 S.Ct. 241, 72 L. Ed. 453; Denton v. Yazoo & M. V. R. Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310; Norfolk & W. Ry. Co. v. Hall (C.C.A.) 57 F.(2d) 1004."

There is no allegation in the complaint to the effect that control over the premises as to the repair of the wells was ever relinquished by the defendant.

The ultimate test is: Whose is the work being done? Standard Oil Company v. Anderson, supra. In determining whose work is being done, the question of the power to control the work is of great importance (Standard Oil Company v. Anderson, supra), but is not conclusive (Linstead v. C. & O. R. Co.; Hull v. Philadelphia & R. R. Co. supra). The identity of the person who, in fact, directs the details of the work and gives the immediate instructions to the workmen is of comparatively small importance, the power of control referred to being the power to control the undertaking as a whole. McLamb v. DuPont Company, supra; Singer Mfg. Co. v. Rahn, supra.

As to specific allegations in the complaint negativing the existence of such facts as would render the plaintiff the special employee of the defendant, it appears affirmatively that the work being done was that of the defendant, at least prior to the time that the Norwood crew, including the plaintiff, voluntarily came upon the scene and started to assist therein. After alleging defendant's ownership of the property and of the wells which were being repaired, it is alleged: " * * * that on April 8, 1934, the defendant, by or through its agents, servants or employees, acting in the regular course of their employment for the defendant, removed a gin pole and three guy wires attached to it from its location over water well No. 2 and erected the same over water well No. 1 just a few minutes prior to the happening of the matters hereinafter complained of. * * * That at the time in question the defendant owned the gin pole and guy wires herein referred to and described and used them in the maintenance of the three water wells in question; that the defendant pumped water from said wells into a storage tank situated on its said land, from which tank water was drawn off through pipes into a storage tank on an adjoining tract of land and from which latter tank it was used by one E. C. Norwood, a drilling contractor, in the drilling of oil wells on said adjoining land; that said water was furnished by the defendant to Norwood under and by virtue of an oral contract by the terms of which Norwood agreed to pay the defendant a stipulated sum each month for the use of the same."

Obviously, prior to the plaintiff's appearance on the scene, defendant was engaged in repairing its own well, as it was required to do under contract to furnish water therefrom, and such work of repair was being carried on by defendant's employees "acting in the regular course of their employment for the defendant" with the defendant's "Gin pole" and equipment. The work so described affirmatively appears, from said allegation, to be the defendant's work. The complaint alleges the plaintiff's participation in the work in question, but nowhere is there any allegation, expressly or otherwise, that there was any agreement of any kind whereby the plaintiff, or his general employer, took over or contracted to perform or in any wise assumed responsibility for all or any part of such work; the only allegation relative to the understanding under which Norwood's crew lent their assistance being: " * * * that such voluntary entry was made upon the premises by Bill Wood and his crew, including plaintiff, with the consent of the defendant, acting through its lease superintendent, Allen Stewart, who was in charge of the defendant's premises and was acting in the regular course of his employment for the defendant."

At the time defendant appeared on the premises the work which was being done was the defendant's work "being done by the defendant's crew" under the supervision of the defendant's lease superintendent, "who was in charge of the defendant's premises and was acting in the regular scope of his employment for the defendant." Here, as in McLamb v. DuPont Company, supra, in order to show that the men who came on the job did not become the special employees of the employer whose work was being so carried on, it would be necessary to show that the control of the undertaking, or of a distinct part thereof, was "relinquished" by such employer and that the new participants in the work, or their general employer "assumed control of the * * * operation, or became responsible for its results."

If there was any relinquishment of control of the undertaking by the defendant, or any assumption of such control or of responsibility for results by Norwood·

or his crew, it must have been by virtue of some understanding between the parties. Pleading on which plaintiff stood was his second amended complaint. He had more than one opportunity to plead such understanding, if such existed. Upon the face of the pleading, it appears that the work which was being done, was the work of the defendant, and that the power to control that work and the men therein engaged was not shown to have been relinquished by the defendant at any time. The situation disclosed comes squarely within the Federal rule.

Nor does the complaint negative defendant's power to control the work: By the allegations of the complaint that the plaintiff and his crew were ordered by their foreman "to proceed with him upon the premises * * * and to perform certain work designated by Bill Wood (plaintiff's foreman) in the repair of said well," or by the allegation "that in the performance by the plaintiff of the work above set forth and at all times while he was· upon the premises of the .defendant and elsewhere, at the 'time and on the occasion in question, he was acting in all things under the direction, supervision and control of his employer, E. C. Norwood, and none other * * *. "

The first part deals merely with an indefinite order given by plaintiff's general foreman, before the crew went on the property, which was neither shown to have been communicated to nor acquiesced in by the defendant. It was merely a direction by Wood to his crew "to go over to the Getty well and I will show you what to do." The question of control over the work is of purely evidentiary importance, and is valuable only as it tends to prove the fact of "whose is the work being, performed." The immateriality of the above allegation is apparent. Evidently no such indefinite remarks by plaintiff's foreman, at least nothing is shown in the pleadings to show it was communicated or made in the presence of the defendant's agent, superintendent, or foreman, or employee of said defendant, could have had any bearing on the question of whether or not the defendant relinquished control of the work. The second part deals with the question of who gave the plaintiff the order which he was shown to have received, after he arrived on the work and before he was injured. He acted under the "direction, supervision and control" of Norwood, or his foreman, in that the only order he received, after arriving on· the job, happened to be given by that foreman. By the same test, the injured employee in the case of McLamb v. DuPont Company, supra, acted in all things under the direct supervision and control of DuPont experts, but as the court there said: "Obviously this question cannot be answered, as the plaintiff seeks to do, by pointing out that the army engineer * * * authorized the DuPont representatives to tell the laborers what they should do and how they should do it, for a superintendent or foreman usually has this authority over laborers and yet does not become thereby an independent contractor."

In the Linstead Case, the Big Four train crew took their direct orders from the Big Four employee who was in charge of the train, but this did not prevent the Supreme Court from holding them to have become the special employees of the Chesapeake & Ohio· Railroad Company, whose work was being done.

In. Denton v. Yazoo & M. V. R. Co., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310:

"The petitioner, a United States railway postal clerk, sustained an injury due to the alleged negligence of one Hunter, a porter in the general service of the two railroad companies named as respondents. Hunter was hired and paid by the Illinois Central Railroad Company. At the time of the injury, he was engaged in loading United States mail into a mail car, under the direction of a United States postal transfer clerk, and was not, as to that work, under the direction or control of either of the railroad companies.

"The mail was being transported by the railroad companies under Chapter 261, § 5, 39 Stat. 412, 429, U.S.C. Title 39, § 541 (39 U.S.C.A. § 541), which requires all railway common carriers to transport such mail 'in the manner, under the conditions, and with the service prescribed by the Postmaster General.' A. regulation of the Postmaster General, adopted by authority of this statute, provides: 'Section 1293 * * * 2. Railroad companies shall furnish the men necessary to handle the mails, to load them into and receive them from the doors of railway pQst office cars, and to load and pile the mails in and unload them from storage and baggage cars, under the direction of the transfer clerk, or clerk in charge of the car, if one is on duty, except as provided in Section 1290. Mails intended for delivery to postal clerk

shall never be placed in a postal car unless there is a clerk on duty to receive and care for them.'"

The question there was whether the porter had become the special employee of the government when he undertook to assist in loading the mails; the court held that he had.

The syllabus is as follows:

"When one person puts his servant at the disposal and under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former."

"Railroad companies are required by statute to transport the mail 'in the manner, under the conditions, and with the service prescribed by the Postmaster General,' and one of his regulations provides that they shall furnish the men necessary to handle the mails and to load them into the ·mail cars under the direction of a transfer clerk, a federal employee. Held that railroad companies are not liable for personal injuries resulting from the negligence of one of their employees while he was engaged in so loading mail, because his work at the time was work of the Government under control of a government agent."

In the Denton opinion, it is said:

" 'In many of the cases the power of substitution or discharge, the payment of wages and other circumstances bearing upon the relation are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power of control.' * * * In each of these cases [Standard Oil Company v. Anderson, supra, and Driscoll v. Towle, 181 Mass. 416, 63 N.E. 922] the facts plainly demonstrated the work was that of the general master, and that in doing it, the servant had not passed under the direction and control of the person for whom the immediate work was being done; the latter being looked to not for commands, but for information."

See Linstead v. Chesapeake & Ohio Ry. Co., supra; Harrel v. Atlas Portland Cement Co. (C.C.A.) 250 F. 83, 85; Brady v. Chicago & G. W. Ry. Co. (C.C.A.) 114 F. 100, 107, 57 L.R.A. 712; Wyllie v. Palmer, 137 N.Y. 248, 257, 33 N.E. 381, 19 L.R.A. 285; Higgins v. Western Union Telegraph Co., 156 N.Y. 75, 78, 50 N.E. 500, 66 Am.St.Rep. 537; Cotter v. Lindgren, 106 Cal. 602, 607, 39 P. 950, 46 Am.St.Rep. 255; Rourke v. White Moss Colliery Co., L.R., 2 C.P.Div. (1876–1877) 205.

As to contention that question of applicability of the Workmen's Compensation Act as to facts disclosed by plaintiff's complaint could not be raised by demurrer, this phase is apparently based on the proposition that the complaint did not expressly negative the possibility that the act was inapplicable by reason of rejection thereof, either by the plaintiff or defendant.

A section, 156-104, of the New Mexico Statutes, Annotated, Compilation 1929, provides: "Every contract of hiring, verbal or written, made subsequent to the time this act takes effect, and every such contract made previous thereto and continued thereafter, shall be presumed to have been so made, or so continued, as the case may be, with reference to the provisions of this act, and unless there be as a part of such contract so made or continued an express statement in writing prior to any accident, either in the contract itself, or by written notice from either party to the other in substance that the provisions of this act are not intended to apply, then it shall be conclusively presumed that the parties have accepted the provisions hereof and have agreed to be bound thereby and were working thereunder at the time of such injury. Minors of the age of fourteen years or over shall have the same contractual powers, hereunder and shall be subject to the provisions of this act to the same extent as adult workmen."

No affirmative action by either party is required to bring them both within the protection of the act. As soon as a person enters another's employ, the act becomes operative unless a written contract of employment is entered into that provides the act shall not be applicable, or written notice is given to that effect. Voiding its applicability is the exception. The act is presumed, by the wording of the statute to apply in all cases. Where pleading fails to allege any facts showing that the act does not apply, its applicability will be presumed on demurrer.

"Where an employee is presumptively within the terms of a compensation act depriving him of any other remedy for his injury, a declaration, petition or complaint failing to allege facts showing that the case is without the act and within an exception, is demurrable * * *." 71 C.J. 1502.

In Madonna v. Wheeling Steel Corporation (C.C.A.) 28 F.(2d) 710, 711, a demurrer was sustained to the complaint in the lower court and judgment for defendant entered upon plaintiff's failure to plead. On appeal, the court said: "There is nothing in the declaration to negative the fact that the defendant corporation was a subscriber to the Workmen's Compensation Act and came within its provisions. Section 22 of the act provides that an employer who elects 'to pay into the workmen's compensation fund the premiums provided * * * shall not be liable to respond in damage at common law or by statute for the injury or death of any employee however occurring.' * * * Where the declaration shows that the defendant is such an employer as comes within the provisions of the Workmen's Compensation Act, it must also make such averments as would take the case without the protection afforded by the act."

See, also, Steagall v. Sloss-Sheffield Steel & Iron Co., 205 Ala. 100, 87 So. 787; Kasulka v. Louisville & N. R. Co., 213 Ala. 463, 105 So. 187; Ruddy v. Morse Dry Dock & Repair Company, 107 Misc. 199, 176 N.Y.S. 731; Gunnoe v. Glogora Coal Co., 93 W.Va. 636, 117 S.E. 484.

The judgment of the lower court is affirmed.