**DEMPSTER MILL MFG. CO. v. LESTER.**

**No. 2196.**

Court of Civil Appeals of Texas. Waco.

July 6, 1939.

Rehearing Denied July 20, 1939.

Touchstone, Wight, Gormley, Strasburger & Price, of Dallas, Tom R. Mears, of Gatesville, and Mueller & Green, of San Antonio, for plaintiff in error.

Richey, Sheehy & Teeling, of Waco, Tom L. Robinson, of Gatesville, and John F. Battaile, of Houston, for defendant in error.

ALEXANDER, Justice.

This suit was brought by Mrs. Kathryn Lester against Dempster Mill Manufacturing Company for damages for injuries resulting in the death of her husband, Herbert Lester. A trial before a jury resulted in judgment for plaintiff for the sum of $5,937.50. The defendant sued out this writ of error.

Dempster Mill Manufacturing Company contends that the said deceased, Herbert Lester, was its employee at the time he received the injuries which caused his death and that he received such injuries in the course of his employment, and, as a consequence, the plaintiff's right of recovery is limited by the terms of the Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq. The material question to be determined is whether or not the deceased was an employee of the Dempster Mill Manufacturing Company at the time he received his injuries. There is no material dispute in the evidence. In 1936, the Evant Independent School District sponsored a project to construct a water system, including the erection of a sixty foot tower and tank and the laying of the necessary pipe. Application was made to the Works Progress Administration for aid thereon. It was finally agreed that the school district would furnish the tower and tank and some of the necessary pipe and fittings and the Works Progress Administration would furnish all labor and the balance of the pipe necessary to complete the project. The school district sub-let to Dempster Mill Manufacturing Company the contract to furnish the tower and tank. In the agreement between Dempster Mill Manufacturing Company and the school district, it was understood that the laborers furnished by the Works Progress Administration were to do all the work that they were capable of doing and were willing to do in the completion of the project, including the erection of the tower and tank, but that on account of lack of experience on the part of these laborers there might be some work in connection with the erection of the tower and tank which they could not or would not do and in that event the Dempster Mill Manufacturing Company was to furnish at its own cost the labor necessary to complete the same. Dempster Mill Manufacturing Company was also to furnish a man familiar with such work to supervise the erection and construction of the tower and tank. Herbert Lester was on the government relief rolls and was what was commonly known as a WPA laborer. The Works Progress Administration selected him and others similarly situated to perform its part of the labor necessary to complete the project. These WPA laborers were employed and paid by the Works Progress Administration and were entirely under the control of its supervisor on the job as to when and where they worked, the hours they should work and as to the character of the work they should perform. Before these men went on the job, the Works Progress Administration's supervisor in charge of the project instructed them that some of the work to be done in connection with the tower was dangerous and that if they did not want to do the work, or if after beginning the work they felt unsafe, they could come down off of the tow-

er and refuse to work thereon, and that this would not endanger their right to employment with the Works Progress Administration. In fact, according to the testimony, the entire project and the WPA laborers working thereon were under the supervision and control of the supervisor furnished by the Works Progress Administration except that Dempster Mill Manufacturing Company furnished a supervisor who instructed the WPA laborers how to do the work in connection with the erection of the tank and tower. The plans called for the painting of the tower after it had been erected. While the deceased, Herbert Lester, and a companion, Grover Wiley, were on the tower putting the last coat of paint on it, the tower collapsed and fell to the ground, killing Lester and seriously injuring Wiley.

In 39 C.J. 1269, the test for determining whether or not the relation of master and servant exists is laid down as follows:

"When Relation Exists—Usual Tests for Determining—aa. In General. The relation of master and servant exists where the employer selects the workman, and may remove or discharge him for misconduct, and may order not only what work shall be done, but the mode and manner of performance.

"Right to Select, Control, and Discharge Servant. To constitute the relation of master and servant for the purpose of fixing liability on the former for acts of the latter under the doctrine of respondeat superior, it is indispensable that the right to select the person claimed to be a servant should exist. Furthermore, something more than the mere right of selection is essential to the relation. This right must be accompanied with the power and duty to control the alleged servant while in his employ; this, it is said, is one of the principal tests of the relation. If workmen do not stand in such relation to the person sought to be charged as to make it his duty to control them, they are not his servants and he is in no sense responsible for their acts under the doctrine of respondeat superior. * * *.

"Right to Discharge. It is also essential to the relation of master and servant that the right to remove for unskillfulness, neglect of duty, or other cause should exist."

Under the facts of this case as applied to the foregoing test, Lester was clearly an employee of Works Progress Administration and not of the Dempster Mill Manufacturing Company. The Works Progress Administration selected and employed Lester, paid him his wages, determined the hours he should work, the character of work he should do, and how and where he should do it, and had the exclusive right to discharge him. The mere fact that Dempster Mill Manufacturing Company furnished a supervisor to give instructions as to how the technical work should be performed in connection with the erection of the tower and tank did not render those who labored on the tower its employees. A like holding has been made under similar facts in numerous other cases. City of Waco v. Hurst, Tex.Civ.App., 131 S.W.2d 745, this day decided; Pittman v. City of Wichita Falls, Tex.Civ.App., 120 S.W.2d 847; Brooks v. City of Seattle, 193 Wash. 253, 74 P.2d 1008; City of Los Angeles v. Industrial Accident Commission, 9 Cal.2d 705, 72 P.2d 540; State ex rel. State Board of Charities v. Nevada Industrial Commission, 55 Nev. 343, 34 P.2d 408; Shelton v. City of Greenville, 169 Tenn. 366, 87 S.W. 2d 1016; Hoover v. Independent School Dist., 220 Iowa 1364, 264 N.W. 611; Todaro v. City of Shreveport, La.App., 170 So. 356; Dabelstein v. City of Omaha, 132 Neb. 710, 273 N.W. 43; Ford v. Independent School Dist., 223 Iowa 795, 273 N.W. 870.

This case does not come within the borrowed servant rule, so as to make Lester the servant of the defendant, as contended for by defendant, for the simple reason that the servant at the time of his injury was performing labor which the Works Progress Administration had obligated itself to do and was not performing work which Dempster Mill Manufacturing Company had obligated itself to do. In order for a laborer to come within the borrowed servant rule, he must be doing the work of the alleged borrower and not the work of the alleged lender. Jones v. George F. Getty Oil Co., 10 Cir., 92 F.2d 255; Higgins v. Western Union Tel. Co., 156 N.Y. 75, 50 N.E. 500, 66 Am.St.Rep. 537; City of Waco v. Hurst, Tex.Civ.App., 131 S.W.2d 745, this day decided. In the case at bar, the Works Progress Administration was to furnish all labor necessary to complete the project, including the erection of the tower and tank. As a safeguard, it was provided in the agreement be-

tween the school district and Dempster Mill Manufacturing Company that if, on account of the character of work required to erect the tower and tank, the WPA laborers could not or would not do it, Dempster Mill Manufacturing Company was to furnish its own laborers to do the work, but that condition had not happened at the time the accident occurred. Lester was still working on the project under his employment with Works Progress Administration, doing the work which that agency had obligated itself to do, and therefore remained its employee at all times. In the case of Maryland Casualty Company v. Donnelly, Tex.Civ.App., 50 S.W.2d 388, 389, relied on by the defendant, Merriweather, the contractor, was using the employee of Busby, the drayman, to do work which Merriweather had obligated himself to do. Consequently, we held therein that Merriweather had borrowed Donnelly, the servant of Busby, and was liable to him as his employer. The same is true of the cases of Judson & Little v. Tucker, Tex.Civ.App., 156 S.W. 225 and Texas Reciprocal Insurance Association v. Latham, Tex.Civ.App., 72 S.W.2d 648, cited and relied on by the defendant. No such condition existed in the case at bar. Consequently, we hold that Lester was not an employee of Dempster Mill Manufacturing Company at the time.

The defendant's second contention is that there was no competent evidence in the record to support the jury's finding that the defendant's negligence caused the fall of the tower. There was evidence by experts that the angle irons used for the legs of the tower were too light, and that the splice irons used to join the sections of the legs were too short. There was evidence that the splice irons furnished by the defendant to join the sections of the tower legs together did not fit, and that the defendant's supervisors in charge of the work caused the leg irons to be cut off with a blow torch, leaving a rough edge instead of a smooth one at the joint. Experts testified that this materially weakened the legs of the tower. The water tank was set nine inches off the center of the tower. There was evidence that this shifting of the extra weight onto one leg of the tower caused it to buckle and fall. The defendant's agent, S. L. Clark, testified that on the morning of the accident, about ten minutes before the tower fell, Blythe, the defendant's supervisor in charge of the erection of the tower, reported to him that the tower was shaky, but that he laughed at the report and

did not give instructions for the plaintiff to come down off of the tower. The jury found that the company's agent discovered that the tower was shaky prior to the accident and was guilty of negligence in failing to warn the workmen on the tower of the danger. The testimony above referred to, coupled with the fact that on a clear day, without the intervention of wind or any other foreign force, the tower collapsed and fell to the ground before the tank had been filled three-fourths full constitute ample evidence to support the jury's finding of negligence on the part of the defendant.

The judgment of the trial court is affirmed.