## CITY OF WACO v. HURST.
### No. 2113.

Court of Civil Appeals of Texas. Waco.
July 6, 1939.

Rehearing Denied Sept. 28, 1939.

Allan Sanford, City Atty., Geo. W. Morrow and Mabel Grey Howell, Asst. City Attys., and Darden, Burleson & Wilson, all of Waco, for appellant.

W. V. Dunnam and F. M. Fitzpatrick, both of Waco, for appellee.

ALEXANDER, Justice.

W. T. Hurst recovered a judgment in the trial court in the sum of $14.000 against the city of Waco for damages for personal injuries sustained by him while loading a truck with sand to be used in constructing a levee along the east bank of the Brazos River in the city of Waco. The city appealed.

The plaintiff alleged in substance that he was an employee of the defendant, the city of Waco, and as such was required to load trucks with sand at the place of excavation for use in constructing the levee, and that it was the duty of the defendant to furnish him a reasonably safe place in which to work; that the defendant negligently caused the same to be excavated and removed from the sand bed in such manner as to create a dangerous embankment and failed to warn him of the danger; and that as a result the sand caved in on him and injured him. The only material question to be determined is whether Hurst, at the time of his injury, was an employee of the city of Waco, as contended by him, or an employee of the Works Progress Administration of the United States Government, as contended by the city. If he was an employee of the city, the duty rested on the city as his employer to provide a reasonably safe place in which to work, but if he was not an employee of the city, the defendant owed him no such duty. The essential facts are these: The city of Waco sponsored a project to repair or improve a

levee along the bank of the Brazos River to prevent the flooding of East Waco. The city applied to Works Progress Administration for aid in the project. The negotiations resulted in an agreement by which the city was to furnish the plans and specifications and a foreman or superintendent to lay out the work to be done and to designate the place where the necessary sand and other materials were to be obtained and to provide a part of the trucks with drivers to haul such materials from the place or origin to the levee. The Works Progress Administration agreed to furnish a project manager, a timekeeper, and a safety man, and the necessary labor to load the sand at the place of origin and to unload and spread it in place on the levee. The Works Progress Administration was also to furnish some of the trucks and drivers used in hauling the material. Hurst was on the government relief rolls and was what was commonly called a WPA laborer. He and approximately 200 others similarly situated were selected and furnished by the Works Progress Administration to do the common labor necessary to carry out its part of the project. The sand for repairing the levee was being taken from the bed or bank of the river. While Hurst was loading a truck with sand at the place where the materials were being obtained, a vertical wall of sand caved in on him and caused the injuries complained of. The city engineer drew the plans and specifications for the project and gave instructions to get the sand and other materials along the east bank of the river. The city had a foreman on the job who laid out the work to be done, but the project manager furnished by the Works Progress Administration directed the removal of the materials, how they should be removed, and how they should be placed in the finished work. There was no evidence as to the condition of the sand bed at the time it was designated by the city engineer as the place from which the sand should be taken, but the evidence does show that these WPA laborers had been working on the project and removing same from the location in question for several months prior to the accident. So far as we are able to ascertain from the record, no one had removed any sand therefrom except these WPA laborers. It is apparent from the evidence that the dangerous condition which existed at the time plaintiff was injured was created wholly by the WPA laborers after they had gone to work in the pit and not by anyone else alleged to be in the employment of the city. The plaintiff had been working on the project, loading sand on to the trucks several weeks prior to his injuries. He testified that on the day of his injuries he had only been working in this particular pit for about ten minutes, when suddenly a vertical wall of sand, approximately six or seven feet high, caved in on him, causing his injuries. There was evidence that other WPA laborers were on top of the embankment, using crow bars and other tools to pry the clay and sand loose. There was no evidence as to the whereabouts of the government safety man at the time.

As we understand the facts, the parties, the city of Waco and the Works Progress Administration, both of whom were governmental agencies, were engaged in a common undertaking for the benefit of the public. The Federal Government, acting through the Works Progress Administration, was interested in promoting the project not only because the levee when constructed would protect some of its citizens from flood waters but because the project would furnish employment for some of those on its relief rolls. Each of the parties obligated itself to perform certain services in connection with the joint enterprise. Among other things, the Works Progress Administration obligated itself to load the sand and other material necessary to the construction of the levee onto the trucks at the pit. For this purpose the Works Progress Administration selected the plaintiff and the other WPA laborers who were on the project. These laborers were entirely under the control of the Works Progress Administration. That agency selected the employee, determined the hours they should work, the character of work they should perform and how and where they should perform it, and paid them their wages. It is true, the city had a general supervisor in charge to see that the project was satisfactory when finished but the Works Progress Administration was in exclusive control of the laborers furnished by it, and directed the manner in which the materials were to be removed from the river bed and placed in the levee.

[1, 2] Many tests have been laid down for the purpose of determining whether or not the relation of master and servant exists. It is generally held that such relation exists only where the alleged employer

has the authority to select the employee, accompanied with the power and duty to control him, not only as to what work shall be done but the mode and manner of its performance and the right to remove for unskillfulness, neglect of duty or for other cause. 39 C.J. 35, 1269. Under the foregoing test, the relief workers who were engaged in loading the sand at the pit were clearly employees of the Works Progress Administration and not the city of Waco. These employees were not only selected, controlled and paid by the Works Progress Administration, but were actually performing labor which that agency had obligated itself to perform. If the Works Progress Administration had been an individual instead of a governmental agency, and the one standing in its shoes had been performing his part of the contract in person—loading the sand on the trucks—instead of employing others to do it for him, no one would have contended that he was working as an employee of the city of Waco. This would have been true, because he would have been performing his own work—work which he had obligated himself to do. For the same reason, when these laborers so selected, controlled and paid by the Works Progress Administration were performing labor which that agency had obligated itself to perform, they were working for and were the employees of the Works Progress Administration and not of the city of Waco.

A similar state of facts was before the Fort Worth Court of Civil Appeals in the case of Pittman v. City of Wichita Falls, 120 S.W.2d 847, and that court held that relief workers furnished by the Works Progress Administration under circumstances such as are here under consideration were employees of the Works Progess Administration and not of the city that sponsored the project. Similar holdings have been made by the courts of other states in the following cases: Brooks v. City of Seattle, 193 Wash. 253, 74 P.2d 1008; City of Los Angeles v. Industrial Accident Commission, 9 Cal.2d 705, 72 P.2d 540; State ex rel. v. Nevada Industrial Commission, 55 Nev. 343, 34 P.2d 408; Shelton v. City of Greenville, 169 Tenn. 366, 87 S.W. 2d 1016; Hoover v. Independent School Dist., 220 Iowa 1364, 264 N.W. 611; Todaro v. City of Shreveport, La.App., 170 So. 356; Dabelstein v. City of Omaha, 132 Neb. 710, 273 N.W. 43; Ford v. Independent School Dist., 223 Iowa 795, 273 N.W. 870. See also Dempster Mill Mfg. Co. v.

Lester, Tex.Civ.App., 131 S.W.2d 254 (this day decided).

Our holding in this respect is not in conflict with our holding in the City of Grandview v. Ingle, 90 S.W.2d 855, relied on by appellee. That suit did not involve the relation of master and servant but was an action by a third person against the city for personal injuries sustained by him as the result of his falling into an opening in the sidewalk from which a culvert had been removed. The culvert in question had been removed by relief workers but they were working under the direct control and supervision of a foreman selected by the City Council. In addition, the evidence showed that one or more of the councilmen actually knew that the culvert had been removed and not replaced when the workmen quit for the evening, and that such knowledge was so obtained by the councilmen in time for them to have removed the danger prior to the accident. While we quoted therein from authorities which discussed the doctrine of "borrowed servants," our holding that the city was liable for the injuries sustained by plaintiff was bottomed on the doctrine that the city was charged with the duty of keeping its streets and sidewalks in a reasonably safe condition for travel and that such duty could not be delegated to another, and that when the city invited relief workers to make excavations in streets and sidewalks for the purpose of improving the same and selected and furnished a supervisor to oversee the work, and such supervisor and the members of the city council actually knew of the removal of the culvert in time to have repaired same, the city was liable for such damages. That holding was sustainable on the ground that the city could not delegate to others the right to make excavations in its sidewalks, and then deny liability for their failure to properly guard the openings. 43 C.J. 949; 39 Tex.Jur. 664–674; Cameron Mill & Elevator Co. v. Anderson, 98 Tex. 156, 81 S.W. 282, 1 L.R.A.,N.S., 198; City of Corsicana v. Tobin, 23 Tex.Civ.App. 492, 57 S.W. 319; Note, 25 A.L.R. 426. The same is true of our holding in the City of Waco v. Thompson, 127 S.W.2d 223. In that case, while the work was being done by WPA laborers outside of the city limits, the culvert, the removal of which caused the damage, was removed under the supervision and direction of a foreman hired by the city in accordance with plans furnished by it, and the city was thereby charged with notice that its foreman, in carrying

748

out its plans, had created a dangerous situation.

The WPA laborers in the case at bar did not come within the "borrowed servant" rule, so as to make them the employees of the city of Waco, as contended by plaintiff, because at the time in question they were performing labor which their employer, the Works Progress Administration, had obligated itself to do and not the work of the alleged borrower. In order to make the servant of an alleged lender the servant of an alleged borrower, he must be doing the work of the alleged borrower. Jones v. Geo. Getty Oil Co., 10 Cir., 92 F.2d 255; Higgins v. Western Union Tel. Co., 156 N. Y. 75, 50 N.E. 500, 66 Am.St.Rep. 537. It is true that the work which these laborers were doing was in a large measure beneficial to the city of Waco, but nevertheless it was work which the Works Progress Administration had obligated itself to do in the promotion of the project and so·long as these laborers were doing that work, they remained the employees of the Works Progress Administration, who had employed them. See Dempster v. Lester, Tex.Civ.App., 131 S.W.2d 254 (this day decided).

The jury found that the city excavated under the embankment in such manner as to cause the sand to cave in on plaintiff, and that it failed to properly slope the embankment, and thereby negligently failed to provide plaintiff with a safe place in which to work and failed to warn him of the danger thereof. Since the plaintiff was not an employee of the city, the doctrine of respondeat superior does not apply and the city was under no obligation to furnish him with a safe place in which to work. There was no evidence that the sand bed was in anywise inherently dangerous at the time it was designated by the city engineer as the place from which the material should be taken. If thereafter it became dangerous, it was because of the excavations made therein by other WPA laborers for whose conduct the city was in nowise responsible. The jury's finding that the city had excavated under the embankment in such manner as to make it dangerous was evidently based on the erroneous assumption that the other WPA laborers were employees of the city.

The case appears to have been fully developed and the record fails to show any liability on the part of the defendant. For this reason, the judgment of the trial court is reversed and judgment rendered that the plaintiff take nothing.