## TEXAS EMPLOYERS INS. ASS'N v. DICKERSON.

### No. 9545.

Court of Civil Appeals of Texas. Austin.

April 17, 1946.

Rehearing Denied. May 8, 1946.

Robertson, Leachman, Payne, Gardere & Lancaster and Henry D. Akin, all of Dallas, for appellant.

White & Yarborough, by W. E. Johnson, all of Dallas, for appellee.

BLAIR, Justice.

This is a workman's compensation case wherein appellee, J. R. Dickerson, sued appellant, Texas Employers Insurance Association, to recover compensation for accidental injury, alleged to have been sustained in the course of his employment with the Butane Equipment Company, Incorporated (the carrier of the insurance under appellant's policy in suit), while lifting a six-inch steel I-beam, precipitating a coronary occlusion, which resulted in his total and permanent incapacity to work.

Appellant denied the total and permanent disability claim of appellee, and his claim that he was injured in the course of his employment with the Butane Equipment Company; and further alleged that the erection of the I-beam was a part of the work which had been contracted to John W. Brown on a turn-key basis; and that if appellee were injured as alleged, it occurred while he was doing the work of Brown, either as a volunteer or as a loaned employee.

The trial to a jury upon special issues resulted in findings that appellee was totally and permanently incapacitated to work as the result of an accidental injury sustained by him while in the course of his employment with the Butane Equipment Company, and that payment of the compensation insurance in a lump sum would be to the best interest of appellee. Accordingly, a lump sum judgment for $6,952.75 was rendered for appellee.

Appellant's first point is that the evidence established as a matter of law that if appellee sustained an injury from lifting the steel I-beam, it was in his performance, either as a volunteer or as a loaned employee, of work over which John W. Brown had the proprietary right to direct and control the work under a written contract with Butane Equipment Company. It is therefore contended that there is no evidence to support the jury's findings that appellee sustained an accidental injury in the course of his employment with Butane Equipment Company, the carrier of the insurance policy in suit.

Butane Equipment Company had been employed in the operation of a plant for making submarine floats for the United States Government. It entered into another contract with the Government to switch over or convert its plant into one for making bomb shells. As a part of this reconstruction work furnaces were required to be erected in which to preheat the bomb shells. John W. Brown made a design for such furnaces and secured from the Butane Equipment Company a "purchase order" for two of them, which were identical in terms, and one is here copied:

"Purchase Order

Butane Equipment Company, Inc., Manufacturers
3301 South Lamar-Telephone H-2146
Mailing Address P.O.Box 1451,
Dallas 1, Texas.
Date February 9, 1944
O.R.D. Order No. 1067

To Mr. John W. Brown   Contract No. W-23-072-
Address 310 Leads Street   ORD-359
"Dallas, Texas   Priority Rating
  Allocation No. 0-1-1q44
Via Erected at our plant   End Use O.P.D 1-A

Quantity Description List Price Discounts Net Price

Furnace 'A'   $1900.00

Material and labor to completely erect one stress-relieving furnace per your design and details. You are to furnish all foundations, brick work and labor for erecting and installing all integral parts for final operation of furnace. We are to furnish you for erection all fabricated steel and car steel frame for lining. We are to furnish you for installation burners, blowers, valves, pipe and instrument Complete

Item 6—Equipment for Contr. Acct.
Stress Relieving Furnace 'A.'
  Butane Equipment Company, Inc.
  By ——————  .

Required Delivery
Jan   July
Feb   Aug
March   Sept
April   Oct
May   Nov
June   Dec

All material subject to provisional U. S. Army Ordnance inspection at source, and final ordnance inspection, and acceptance at destination."

As stipulated in the purchase order the Butane Equipment Company was to do the steel fabrication work, which meant the conversion of the raw material into the finished parts going into the frame around which the brick furnace was to be constructed. This included the cutting of I-beams into proper lengths and sizes and placing holes at the bottom for bolting them to the foundation, and the welding of them together after they had been placed in the frame structure. To do this work Butane Equipment Company employed appellee as

148

its foreman, supervisor, or as maintenance man, and furnished him some three or four workmen to assist in the work.

The work of reconversion of the plant was being done under stress orders, and the work of making bomb shells was supposed to start about March 15, 1944. Appellee testified that on March 6, 1944, R. C. Biggs, the general superintendent of Butane Equipment Company, told appellee to get out there and get that furnace to going, and do everything he could to complete it, that they couldn't complete it as it was in time. Appellee testified that they were short of labor, and that in carrying out the foregoing instruction of the general superintendent to get the erection of the furnace going and completed and while so working he received an injury; that at the time he hurt himself he was lifting a steel six-inch I-beam fourteen feet long; that he and three others (two bricklayers and one laborer) brought the I-beam over; they had to raise it up on its end and to lift it and set it over some bolts to be bolted down, so that it could be welded to the frame; that when he and the others lifted it up, he and the bricklayers set it on the bolts; that he got around the I-beam and got it between his knees and his arms around it, and lifted it on the bolts to be bolted down; and that when he turned it loose he kind of froze to it, that is, his arms pained and one had a kind of pain in it, and it was kind of a cramp; that sweat broke out on him, and that he sat down and did no more work. He was paid for his work by Butane Equipment Company. He continued to suffer, and after his evening meal at home a doctor was called, who gave him a sedative for rest, and on the following morning he was taken to the hospital, where he remained about 66 days, suffering of what the doctor testified was a coronary occlusion, which they also testified was precipitated by the lifting of the steel I-beam.

Biggs, the general superintendent of the Butane Equipment Company, testified that he did not tell appellee to do any of Brown's work, but told him to go out there and do all he could to expedite the erection of the furnace, or words to that effect. Appellee testified that he knew Brown, the furnace man for the brick work on the furnace; that he did not know that Butane Equipment Company had let the contract to Brown to erect the steel work; that he did the erecting of the steel work, that is, he supervised it and helped the welder, and had it cut and had him weld all of the steel, which is what he called fabricating the steel, and that he prefabricated it before he set it up, and he set it up; that he never saw Brown's contract, but that Biggs told him to do the work, but did not tell him whose work it was; that he never saw any contract with Brown, and did not know whether it was Brown's work or Butane's work; and that he was not a common laborer; that nobody told him to lift the particular I-beam, but that Biggs told him to get out there and get that work finished and to do all he could toward the completion of the work so that the plant might be put in operation in time.

Brown testified that under the terms of his purchase order with Butane Equipment Company, he agreed to erect the furnace and that he did the erection of the fabricated steel; that he never saw appellee assisting his employees in lifting the I-beam in place, and never saw him doing any physical labor on that job. He further testified that he never used appellee either as a volunteer or as a borrowed employee, and that he never watched appellee as he was not his man and he wasn't under him at all. He further testified that by fabricating the steel is meant the welding of it, and part of this was done before the steel was erected and part afterwards; that the I-beams were fastened by two bolts at the bottom set in concrete, and were welded at the plate head before they were brought into the furnace, and that the welding did not have anything to do with the erection of the steel for the furnace.

In the submission of the special issues to the jury as to whether appellee sustained an accidental injury in the course of his employment with the Butane Equipment Company, the insurance carrier, the court defined the term "employee" in the pertinent language of Art. 8309, Sec. 1, Vernon's Ann.Civ.St. which reads:

" 'Employee' shall mean every person in the service of another under any contract of hire, expressed or implied, oral or written, except masters of or seamen on vessels engaged in interstate or foreign commerce, and except one whose employment is not in the usual course of the trade, business, profession or occupation of his employer; provided that an employee who is employed in the usual course of the trade, business, profession or occupation of an employer and who is temporarily directed or instructed by his employer to perform service outside of the usual course of trade, business, profession or occupation of his employer is also an employee while performing such service pursuant to such instructions or directions; and provided further, that such persons, other than independent contractors and their employees, as may be engaged in the work of the employer of enlargement, construction, remodeling or repairing of the premises or buildings used or to be used in the conduct of the business of the employer shall be deemed employees."

■ In view of this express language of the statute and the foregoing facts, we think that the evidence fully supports the jury's findings that appellee sustained an accidental personal injury while in the course of his employment with the Butane Equipment Company, the insurance carrier under the policy in suit.

The foregoing evidence showed without dispute that the Butane Equipment Company, the carrier of the insurance involved here, was under contract with the Government to enlarge, reconstruct, remodel, and repair its premises and buildings to be used thereafter for making bomb shells; that the work was in progress; and that the Butane Company had employed appellee and was using him to aid in the doing of the work at the time he sustained his injury from lifting the steel I-beam in place. Under the express language of the statute defining an employee and the facts adduced, appellee was clearly an employee of Butane Equipment Company at the time he sustained his injury. He had not been borrowed by nor loaned to Brown. Brown expressly denied ever having exercised any jurisdiction or control over appellee or that he had any right to do so; and that he knew nothing of appellee's having lifted the I-beam while helping to place it in the frame structure of the furnace; and that he had employees there to do that work.

■ Nor was appellee a volunteer in doing the work of lifting the I-beam in place. Both he and the general superintendent of the Butane Equipment Company testified that on the day he was injured appellee was instructed to go to the place where the furnace was being erected and to do everything he could to expedite and complete the construction of it. The lifting of the I-beam and placing of it in the frame structure around which the furnace was to be built was a necessary part of that work and appellee was doing such work under the express instruction of the Butane Equipment Company in carrying out its contract with the Government to enlarge, reconstruct and convert its premises and buildings into the business of making bomb shells.

■ Brown was not an independent contractor under the terms of the purchase order for the erection of the furnace. Such order gave him no proprietary right or exclusive control over appellee in the performance of the work of lifting the steel I-beam in place in the frame structure of the furnace. By its terms Brown merely sold the Butane Equipment Company the design or plan for the construction or erection of the heating furnace, with the further provision that Brown would furnish some of the material and labor and the Butane Equipment Company would furnish some of the material and labor for the erection of the furnace, which the Butane Equipment Company had contracted with the Government to construct and operate in its business of making bomb shells for the use of the Government. The purchase order contained no provision whereby the Butane Equipment Company relinquished to Brown the proprietary right or exclusive control of the work of erecting or constructing the furnace. The rule as regards the test of when the servant or employee of one becomes the servant or employee of another is stated in the case of Independent-Eastern Torpedo Co. v. Herrington,

Tex.Civ.App., 59 S.W.2d 222, 224, affirmed Tex.Com.App., 95 S.W.2d 377, as follows:

"* * * a general servant of one employer may become the particular servant of another, who may become liable for his acts while performing a particular service. But that rule has no application under the facts in this case. In order for it to apply, the person to whom the general employer intrusts his servant must have a proprietary interest in the work in which the servant is used and must have the right to exercise exclusive control of the servant in carrying on that work. 'He is deemed the master who has the supreme choice, control, and direction of the servant, and whose will the servant represents not merely in the ultimate result of the work, but in all its details.' Cunningham v. [International] Railroad, 51 Tex. 503, 32 Am.Rep. 632. The applicable test is stated in 18 R.C.L. p. 784, in this language: 'In determining whether, in respect of a particular act, a loaned servant is the servant of his original master or of the person to whom he has been furnished, the general test is whether the act is done in the business of which the person is in control as a proprietor.'"

In the instant case appellee continued to be under the direction and control of his employer, the Butane Equipment Company, and was in fact doing the work he had been instructed to do by his employer at the time of his injury. The undisputed evidence excludes any relationship of a volunteer on the part of appellee; and Brown, the asserted independent contractor, testified that appellee had not been lent to or hired by him, or directed or controlled by him in any manner in which the work of lifting the I-beam in place was performed, and from which act he received his injury. Under the facts appellee was not an employee of Brown; "the test being whether in the particular service which he is engaged to perform he continues to be under the direction and control of his masters or becomes subject to that of the person to whom he has been lent or hired." 35 Am.Jur. 455, § 18; Liberty Mutual Ins. Co. v. Boggs, 66 S.W.2d 787; Maryland Casualty Co. v. Stewart, Tex.Civ.App., 164 S.W.2d 800 (writ ref.). These cases apply the settled rule that the right of control of a person in doing the work or performing the service is the test by which it is determined whether the relation is that of employer and employee.

In the instant case the Butane Equipment Company had contracted with the Government to do the work necessary to convert its business or plant into one for making bomb shells, and the erection of the furnace was a part of the work necessary to do under the contract. In doing that work it employed appellee and instructed him to do whatever was necessary to get the work going and to complete it; and the work being done was that which Butane Equipment Company had obligated itself to do. These facts bring the instant case within the rule announced in Dempster Mill v. Lester, Tex.Civ.App., 131 S.W.2d 254; and the City of Waco v. Hurst, Tex.Civ.App., 131 S.W.2d 745, 748, wherein the court say:

"It was work which the Works Progress Administration had obligated itself to do in the promotion of the project and so long as these laborers were doing that work, they remained the employees of the Works Progress Administration, who had employed them."

The point is made by appellant that a jury issue was raised by the evidence as to whether in lifting the I-beam in place appellee was performing, either as a volunteer or a loaned employee, the work over which John W. Brown had the proprietary interest, and that the court erred in refusing to submit "any" issue thereon. Our foregoing conclusions that the undisputed evidence showed that appellee was neither a volunteer nor a loaned employee in the performance of the work at the time of his injury, sustains the action of the trial court in refusing to submit the requested issues.

The three remaining points of appellant are in substance that:

1. The evidence of appellee did not show that his coronary occlusion would not have occurred but for the strain in lifting the I-beam.

2. Appellee was not entitled to recover in absence of a jury finding that his injury was the natural result of lifting the I-beam.

3. Appellee was not entitled to recover since the evidence failed as a matter of law

to show that he received an injury resulting in total permanent disability.

The jury found in answer to Special Issues Nos. 1 to 4 that appellee sustained personal injuries on or about March 6, 1944; that such injuries were sustained while in the course of his employment with Butane Equipment Company, Inc.; that such injuries were accidental; and that he sustained total incapacity as a natural result of such injuries. These findings of the jury are sustained by sufficient evidence.

■ Point 2 presents no error because the jury found in answer to the special issues that appellee was injured in the course of his employment, which injury resulted in his total incapacity "as a natural result" of such injury. The testimony showed, or authorized the jury to find, that the injury was caused by lifting the I-beam.

■ Points 1 and 3 relate to the alleged insufficiency of the evidence to show that appellee sustained a coronary occlusion as the result of lifting the I-beam, and that the injury (coronary occlusion) resulted in the total permanent disability of appellee to work. Two doctors who treated appellee testified in the case. Dr. R. W. Cowart, in part, testified as follows:

"Q. Back on March 6th of 1944 did you have occasion to see him about that time? A. Yes, I was called to his house to see him.

"Q. Whereabouts did you see him, doctor? A. In his home.

"Q. When you got there, in what condition did you find him? Describe to the jury. A. He apparently was violently sick, complaining of violent pains in his chest and slightly nauseated and pale as ghost and pain went out into his left arm.

"Q. What did you do for him at that time, doctor? A. I gave him medicine hypodermically for relief.

"Q. Did you see him after that time? A. I saw him again the following morning.

"Q. And in what condition did you find him at that time? A. He was much relieved but he was still distressed.

"Q. And what did you recommend? A. I recommended he go to a hospital. I told him what I thought was the matter with him, and told him to go to a hospital for treatment.

"Q. Did you get him in a hospital? A. I got him over at the Veterans Hospital. He told me he was a World War Veteran, and I called over there and secured a bed over there for him.

"Q. From you observation and examination of him, what was your tentative diagnosis of what was wrong with him in your opinion? A. Coronary occlusion.

"Q. Did you get any history of the case, doctor? A. Yes, sir.

"Q. What history did you get of his case? A. He said he had been working that afternoon on some construction job; it was heavy metal, I believe it was a construction job, and that he lifted a heavy piece of metal and that he felt a pain come in his chest and had to fall out right then, and he waited a little while and he got ready to go on home, and he still had some distress in his chest, and he lay down for awhile and later he got up, and I believe he said he went to get something somewhere, he went out of the house a little while, and the pain got worse and worse and he came back home and then is when they called me, I should say along about 3:30 in the afternoon, somewhere along there in the evening.

"Q. On the basis of the condition you found him in, and the history he gave you of the case, in your opinion was there any connection between this lifting and the precipitation of the coronary occlusion? A. Well, yes, I think that was a factor.

"Q. At the time you saw this man, doctor, in your opinion was he able to do manual labor? A. Oh, he was hardly able to live—man.

"Q. In your opinion, tell the jury whether or not that disability to do manual labor is temporary or permanent? A. In my opinion it is always permanent.

"Q. Doctor, pay close attention to this question. In your opinion from the history of the case as given you and your examination of the man, was the lifting a precipitating cause? A. I think it is the precipitating cause."

Dr. Bernard Lipschultz testified as follows:

"Q. Doctor, on or about the 7th day of March—do you know Mr. J. R. Dickerson, the man sitting back here? A. Yes sir.

"Q. Do you recall him being a patient there on or about the 7th of March of last year? A. Yes sir.

"Q. Did you treat him? A. Yes sir.

"Q. What did you treat him for, doctor? A. I treated him for an acute coronary occlusion.

"Q. Did you get a history of the case when you began to treat him? A. Yes sir.

"Q. What history did you get? A. Mr. Dickerson told me that a date prior to coming in the hospital while he was at work he was assisting some men in lifting a heavy beam or heavy piece of steel, I don't know exactly what it was for, and that at that time while he was assisting in lifting this beam he developed a severe pain around his heart, and he had to stop his work at that time, and he told me he could hardly catch his breath and broke out into a sweat and he was taken home; the following day when he was admitted to the hospital, that is when I saw him, the day after this happened, and my examination plus the special examination that we took revealed definite evidence of an acute coronary occlusion.

"Q. Doctor, from the history that you got of this lift and the coronary occlusion that you found, state whether or not in your opinion there was a causal connection between the lifting and the coronary occlusion? A. Yes sir. It is a well known fact that coronary occlusion can occur during the time of any amount of abnormal strain especially in a middle aged man or elderly man.

"Q. In this particular case from the history that you got, in your opinion was the coronary occlusion precipitated or brought about by the lift? A. Yes sir.

"Q. At the time that he got this lift and severe pain in his chest, it is also in evidence that he suffered pain down his arm at times. What, in your opinion, took place in the heart or around or about the heart, I mean by that, was there any damage to the physical structure of the heart that took place in your opinion when he gave this lift? A. Yes sir, definitely was considerable damage at that time. What happened, one of the major blood vessels supplying the heart mostly clotted up. In other words, a clot formed within those blood vessels, and as a result the blood supply which that blood vessel normally supplied to the heart was impaired, and the heart mostly damaged as a result of the lack of blood supply.

"Q. When you first saw this man, was he able to work, in your opinion? A. No sir."

Appellee remained in the hospital 66 days, and Dr. Lipschultz further testified as to his condition:

"Q. When you discharged him from the hospital, in your opinion, was he able to do manual labor then? A. No sir.

"Q. In your opinion will this man ever be able to secure and retain employment and perform the usual tasks of a workman? A. I would like to supplement that if I might.

"Q. All right, I mean manual labor, Doctor, whether or not in your opinion the incapacity that we said he had is permanent or not? A. The damage resulting is permanent, and it leaves the heart in a weakened condition, and I wouldn't recommend anyone who had sustained such a heart injury to do any manual labor.

"Q. Would it be dangerous, in your opinion, for him to attempt it? A. Yes, it would.

"Q. What might probably result? A. Well, one of several things—I am going on the basis that this man had sustained permanent damage to the heart—what could happen is this clot or the heart wall where this clot occurred is weak, and if this man was to return to work, doing arduous labor consisting of manual labor, the heart muscle at that point is weakened and as a result it might become, under such a strain, it would actually rupture the heart. And another danger is a man who has sustained a coronary occlusion can get another one another place because he has already had one and many attacks have occurred in one patient at the same time. He may not be.

fortunate enough to live through another one. Many die on the spot after an attack. * * *

"Q. Doctor, I will also add that it is in evidence further that this man, so far as he knows, had never had any heart trouble before, that is so far as he knew. He had done manual labor and had worked continuously, with the exception of about 25 days in the year immediately preceding this attack. Doctor, in your opinion, in this particular case did the lift produce the heart attack? A. The lift itself did not produce it; we call it precipitated it, or initiated it.

"Q. In your opinion did the lift itself inflict damage and harm to the physical structure of the body at the time he lifted? A. In this case it did."

The foregoing evidence fully supports the jury's findings that appellee sustained an accidental injury while working in the course of his employment with Butane Equipment Company, and that such injury resulted in his total permanent incapacity to work as the natural result of such injury.

The judgment of the trial court is affirmed.

Affirmed.